604 A.2d 253

Perry A. EAGLE, M.D.

v.

Welby O. SNYDER, Jr., and Betty E. Snyder, Appellants.

BUTLER & PAUL ASSOCIATES

v.

Welby O. SNYDER, Jr., and Betty E. Snyder, Appellants.

Superior Court of Pennsylvania.

Argued Jan. 23, 1991.

Filed Jan. 21, 1992.

Reargument Denied March 30, 1992.

558

Robert J. Brown, York, for appellants.

Charles B. Calkins, York, for Eagle, appellee.

Douglas P. France, York, for Butler & Associates, appellee.

Before OLSZEWSKI, BECK and TAMILIA, JJ.

TAMILIA, Judge:

This consolidated appeal is based on the claims of appellee physicians for fees for professional services resulting from surgery performed on Welby O. Snyder, Jr. The claims were first presented to arbitrators who found in favor of each appellee physician. The arbitration awards were appealed and pursuant to a petition for consolidation the cases were heard by the trial court as a consolidated action without a jury. Following a decision in favor of appellees and denial of post-trial motions, appeals were taken to this Court.

This case arose out of a surgical procedure performed on February 20, 1986 by Dr. Ivan Butler, a neurosurgeon, and Dr. Perry A. Eagle, an orthopedic surgeon, who together performed an anterior cervical diskectomy with cervical fusion on the neck of Mr. Snyder. There had been no prior discussion or agreement concerning the charges for the surgery. This procedure was successful and subsequently both Dr. Eagle and Dr. Butler of Butler & Paul Associates,

submitted bills to Mr. Snyder who, in turn, submitted them to his employer, Caterpillar Tractor Company, which is self-insured, for payment of hospital and medical expenses.

Butler & Paul Associates' bill was in the amount of $2,915 and it indicated that Dr. Butler had performed a procedure classified under the Physicians Current Procedural Terminology (C.P.T.) as "22555," defined as "anterior cervical diskectomy and fusion." Shortly thereafter, Dr. Eagle submitted a bill for $2,000 for a procedure designated as "22615" under the C.P.T., defined as "anterior cervical fusion C–4,5 using allografts." It was determined by Caterpillar that Dr. Butler had billed for the wrong procedure and should have billed for a C.P.T. procedure "63075", defined as a "diskectomy, cervical, anterior single space without fusion." Caterpillar then paid Butler & Paul Associates the sum of $1,995 and Dr. Eagle $950.

■■■ The central issue proposed by the appellant is the failure of the court to give weight to appellant's expert Dr. Heartenstein concerning the probative value of his testimony. The court gave Dr. Heartenstein's testimony no weight as it concluded his evaluation of the reasonableness of medical fees was based on what was customary and reasonable in other areas, that is the fees charged for similar operations in up to 90 areas throughout the country. The court determined that the correct statement of Pennsylvania law, as espoused in *Husik v. Lever,* 95 Pa.Super. 258 (1928), is what the services are ordinarily worth in the community. While this is a correct statement of the law it must also be interpreted in relation to the realities of medical practice in the 1980's and 90's, which are extremely different than in 1928 when *Husik* was decided. Additionally, it appears appellees are the sole source for performance of this procedure in York County, thereby severely limiting a reasonable appraisal of a fair price to charge for the procedure.

Two modern realities exist that require a broader consideration than a mere community standard in determining reasonable fees. The first is medical insurance and private

and governmental providers which have entered the market place and which to some degree regulate medical costs which have grown faster than prices in any other area of our economy. A vehicle to provide standardization of procedures and the concomitant prices charged for them is the C.P.T. While the trial court ignored this coding, both Drs. Butler and Eagle used the code in billing appellants for their services. The trial court ignores the importance of the code and determines billing duplication or errors in coding is irrelevant to the outcome of this case. This cannot be so when insurance carriers such as Blue Cross, Blue Shield and government providers such as Medicare rely on these pricing standards to provide payment for their insureds.

The second reality in recent times is the dispersal of surgical and diagnostic services. Insured persons now select their doctor or hospital according to expertise, reputation and specialities developed in different areas. It is now routine for people to seek treatment outside the community or area in which they live or receive insurance coverage. The community standard in the place of residence where coverage was obtained cannot be applied if the service is provided in a different location. To acknowledge that pricing and reimbursement may occur at different locations is to require a broader pricing concept than community standards moving toward a more uniform regional or national standard. For this reason, C.P.T. standards should be admissible here.

The record establishes Dr. Butler's group is the only group in York County which furnishes neurological medical services. It is, therefore, arguable that its charges alone should not be the base upon which community standards are established, since, in a sense, the price is dictated under those circumstances by monopolistic forces. Caterpillar, which insures appellant as a self-insured employer, has two thousand employees in the York Plant. As such, its Medical Director of Group Insurance for Caterpillar, Dr. Heartenstein, supervises payment for medical and hospital expenses to 60,000 Caterpillar employees, nationwide, includ-

ing the employees in York. His testimony is relevant as to the going rate for this surgery in the York area as well as other areas throughout the country. The error was in permitting Drs. Butler and Eagle's billings to establish the community worth by their own billing, without requiring them to establish billings in the immediate surrounding areas. Billing by the doctors' clerks cannot establish the community rate, which was what occurred here. If the billing was done in a metropolitan area such as Philadelphia (where *Husik* was decided) or Allegheny County, there would, without question, be a broad enough base for determining a community standard existed without looking outside the community. In this situation, however, the area of York and surrounding counties would provide a more reliable and equitable base than York itself, where only one practice exists. Instead of looking to Baltimore, as appellees indicated, because of its distance and differing economic, geographic and demographic compositions which is not comparable to the "community" of York, a more reasonable approach would have been to look to Cumberland, Dauphin and Lancaster counties which border upon York and have similar demographics and economic bases, so that the market would be more compatible with that of York. The testimony of Dr. Heartenstein was not irrelevant as it applied to area standards and it established the fees charged by Drs. Butler and Eagle were the highest fees charged in any area in the country by more than 30 per cent and the practice of "bundling" or double billing in this case was partly responsible for the excessive charge. Ignoring the C.P.T. coding, as did the trial court, also permitted critical evidence of miscoding by Dr. Butler to be ignored. Dr. Henderson, whose testimony also was ignored by the trial court, testified the procedure employed by Dr. Butler should have been designated a "63075" (cervical diskectomy) instead of a "22555" procedure which was coded on the bill by his clerk. Dr. Butler conceded his billing was in error but the fee of $2,990 would have been and should have been the same. Dr. Butler also stated he does not know what other physicians charge as the usual and cus-

tomary fees for those services in York County. Dr. Eagle billed $2,200 for a "22555" procedure. In essence, both doctors billed for a fusion procedure. Once it was determined what part of the total surgery each doctor performed, payment according to area standards was disbursed. Caterpillar allowed Dr. Butler $1,995 and Dr. Eagle $950. According to established guidelines under C.P.T. coding and to avoid bundling (separate billing on a single operation which divides the operation into different parts and charges separately for the two) the coding provides for modifiers. A modifier is a number "62" in this case, to indicate a second surgeon is involved in the surgical procedure as a result of which the second surgeon's fee is billed at either 50 per cent or 75 per cent.

For the above reasons this case cannot be resolved simply on the basis of "community worth" when the practice of medicine, particularly surgical procedures, spills over arbitrarily established community boundaries. This is particularly true when the number of practitioners of a particular procedure have no peers in the immediate community to establish other than a monopolist price. *See McKeehan Estate*, 358 Pa. 548, 57 A.2d 907 (1948), and *Fougeray v. Pflieger*, 314 Pa. 65, 170 A. 257 (1934). Under these circumstances a fair price cannot be the market price as there is no market price in York for this service other than that supplied by appellees. The approach suggested by appellants to establish an area price in the absence of a community worth has great logic and credibility and the expert testimony provided by appellants should have been given proper weight for the probative value it contained. While the trial court in fact permitted Dr. Heartenstein's testimony to be placed on the record, by ignoring the testimony and giving it no weight, the effect was the same as not to admit it at all. Refusing to admit expert testimony which is proper and essential to a party's case is error which requires a new trial. *Bob Wark's Arco, Inc. v. Commonwealth of Pennsylvania, et al.*, 71 Pa.Cmwlth.Court 644, 455 A.2d 770 (1983).

While *Husik* remains the law, it cannot be so narrowly construed to a county locale and such a limited practice in light of today's standards as is done by the trial court.

While it may be argued that *Pfeiffer v. Dyer*, 295 Pa. 306, 145 A. 284 (1929), in the past has allowed flexibility in billing to permit doctors to exercise discretion in charging higher fees to those who are wealthier to counterbalance free services or diminished payment from those who do not have the financial resources to pay the full fee, it has little application to this case or modern practice. Because of the advent of medical insurance and Medicare as mentioned above, and also due to the different perception of doctors concerning the practice of medicine, the rationale employed in *Pfeiffer* is far more difficult to sustain. The specific facts of *Pfeiffer* show it is not applicable here. The court there justified the doctor's fee on humanitarian considerations after making the following observation:

> Pressed on cross-examination to state his customary fee for such an operation as that here involved, he said that in over twenty years' experience in surgery he had performed the operation six times, three times for nothing, and in explanation added that over half of his professional work was done for charity.

*Id.*, 295 Pa. at 310, 145 A. at 285. No facts were developed in this case to show compensatory adjustments were made in the fees claimed to account for charity by Drs. Butler and Eagle.

A major crisis exists in medical care in our society because 30 per cent of our population cannot afford it and, therefore, cannot obtain even minimal services. People are turned away from hospitals because they cannot afford treatment and provisions for payment must be made in advance, in most cases, before doctors will provide treatment. The fees charged in this case are not subject to any humanitarian credit as appellants are not wealthy and the self-insured employer is committed to reasonable standardized payments even if appellees had established a charitable basis for the higher fees.

In view of our holding on the issue relating to the admission of Dr. Heartenstein's expert testimony, the other issues proposed by appellants need not be discussed. The judgment is, therefore, vacated and the case remanded for the purpose of having the trial court give proper weight to appellant's expert witness testimony and to rule accordingly thereafter.

Jurisdiction relinquished.

BECK, J., files dissenting opinion.

BECK, Judge, dissenting.

In this consolidated appeal, we must decide whether amounts charged by two doctors for a surgical procedure are reasonable and may, therefore, be recovered in an action for those amounts. In so deciding, we must apply and clarify the standards of Pennsylvania law for determining what is a reasonable fee for a specific medical procedure. I dissent because the majority does not apply the law of Pennsylvania, by which we are bound, but rather remakes the law based on the majority's generalized perceptions concerning the practice of medicine in this country, for which there is no evidentiary support in this record.

This case arises out of a surgical procedure performed on appellant, Welby O. Snyder, Jr., on February 20, 1986. Mr. Snyder was experiencing neck and back problems and was referred by his family physician to Dr. Butler, a neurosurgeon, for treatment. Dr. Butler practices in York County in association with appellee Butler & Paul Associates, P.C.. After examining Mr. Snyder, Dr. Butler recommended that a procedure called an "anterior cervical discectomy with cervical fusion" be performed. Dr. Butler explained the procedure to Mr. Snyder, who agreed that it should be done. Dr. Butler also informed Mr. Snyder that the procedure would be performed by two surgeons, Dr. Butler and co-appellee Dr. Eagle, an orthopedic surgeon practicing in York County. Mr. Snyder was also examined by and con-

sulted with Dr. Eagle prior to surgery. The cost of the procedure was not discussed with either doctor.

The operation was performed and was completely successful. The doctors then billed Mr. Snyder for their services. Dr. Butler charged $2,915.00 and Dr. Eagle charged $2,200.00. Since Mr. Snyder is employed by Caterpillar Tractor Company, which maintains its own insurance program for payment of hospital and medical expenses, Mr. Snyder submitted these bills for payment to Caterpillar. Caterpillar adjudged the charges by both doctors to be excessive and refused to make full payment. Caterpillar paid only $1,995.00 to Dr. Butler and $950 to Dr. Eagle.

The doctors then instituted separate lawsuits against Mr. Snyder for the balances due. Caterpillar undertook the defense of the actions for Mr. Snyder. Both actions were initially resolved in the doctors' favor through compulsory judicial arbitration. Caterpillar appealed on Mr. Snyder's behalf, the actions were consolidated and a trial de novo without a jury was conducted.

The evidence presented at trial in support of Dr. Eagle's claim consisted of testimony by Dr. Eagle and by Dr. Cohen, another orthopedic surgeon practicing in York County. Dr. Eagle described in detail the portion of the procedure he had performed on Mr. Snyder, which basically consisted of a bone fusion in Mr. Snyder's neck to replace bone that had been removed by Dr. Butler. He also testified that he had performed this procedure countless times, including 42 such operations in 1986 alone, and that his fee for the same procedure done on other patients was the same as the fee charged to Mr. Snyder. As to the manner of setting this fee, Dr. Eagle stated that he indicates the procedure done and fee to be charged on a card he prepares after surgery and gives the card to his billing clerk, who then prepares the bill. Dr. Eagle further testified that he was familiar with the fees charged by other orthopedic surgeons in York County for this procedure and that his fee was in harmony with those charged by the other orthopedic specialists. Lastly, Dr. Eagle testified that it was advisable

for two doctors, one orthopedic surgeon and one neurosurgeon, to perform the surgery in question, as he and Dr. Butler had done, instead of one doctor performing both portions of the operation. He testified that this afforded a better opportunity to deal with certain complications that might arise in the course of the procedure.

Dr. Cohen, who was qualified as an expert, testified that he was familiar with fees charged for this procedure by other York County orthopedic surgeons and that Dr. Eagle's fee was usual and customary for this procedure in that area. He also testified that this procedure was customarily done in the York county area by two doctors, a neurosurgeon and an orthopedic surgeon, and that the use of two surgeons was advisable.

The evidence presented in support of Dr. Butler's claim consisted of the testimony of Dr. Butler and of his billing clerk. Dr. Butler testified as to the procedure he had performed and as to the manner in which he arrived at his fee. He stated that his fee schedule was initially created as a result of consultation with other physicians practicing in the Baltimore area near York County, and that the fees were then periodically adjusted upwards to account for increased malpractice insurance rates and other rising costs. The doctor also stated that some of the riskier procedures performed were billed at a higher rate. He further testified that he and the other two neurosurgeons with whom he practiced were the only neurosurgeons in York County and they all charged the same amount as that charged Mr. Snyder for the same surgical procedure.

Dr. Butler's billing clerk then testified that she prepared the bill to be sent to Mr. Snyder. She prepared it by referring to a card given to her by Dr. Butler on which was indicated the procedure done on Mr. Snyder. She testified that the base fee charged for the procedure was $2,400 and that $450 was added to that amount in this case because there was the added complication of a bone spur which had to be removed from Mr. Snyder's neck.

At the close of Dr. Butler's case, Caterpillar moved for a compulsory nonsuit, which was refused. Caterpillar then put on its case, consisting of the testimony of two witnesses, Dr. Henderson and Dr. Heartenstein. Dr. Henderson, a neurosurgeon, was called not to address the reasonableness of the doctors' fees, but rather to testify to what he considered to be adequate physician billing procedures. He was qualified as an expert on that subject. The import of his testimony was basically that Drs. Eagle and Butler had used inappropriate code numbers to identify the procedures they had done on Mr. Snyder on the bills they sent him. The code numbers referred to are numbers assigned to a variety of medical procedures in a manual called the Physician's Current Procedural Terminology (the "CPT"). The CPT is apparently used by many medical insurers to distinguish between and identify various medical procedures. Such insurers require that bills submitted to them bear an identifying code from the manual. However, as Dr. Henderson testified, there is no requirement of law or even by any physician's association, such as the American Medical Association, that physicians use the CPT codes on their bills or for any purpose. Dr. Henderson specifically stated that he was completely unfamiliar with what might be the customary billing procedures used by doctors practicing in York County and, therefore, with whether or how these codes were used for billing purposes in that area.

Dr. Henderson further testified that in his view, it was reasonable medical procedure for only one doctor to perform the entire procedure done on Mr. Snyder. Finally, he concluded that although Drs. Eagle and Butler had each only performed part of the procedure, the code numbers they used on their bills appeared to reflect that each was charging for having done the entire procedure.

The final testimony offered was elicited from Dr. Heartenstein, a general surgeon who since 1981 had been employed by Caterpillar as their Medical Director of Group Insurance. Dr. Heartenstein was qualified as an expert to address the reasonableness of the fees charged Mr. Snyder,

subject to the trial court's exercise of discretion in determining the weight to be accorded that testimony.

Dr. Heartenstein testified that he had no familiarity with amounts charged by other doctors in 1986 in York County or in the general south central portion of Pennsylvania for the procedure performed on Mr. Snyder. He did testify, however, that based on broad experience with fees charged for such a procedure in other areas across the country, the fees charged in this case were excessive. He also stated that for purposes of deciding what amount of a medical bill Caterpillar would pay under its self-insurance plan, Caterpillar would look to what other doctors in the same county charged. If there were no other doctors, they looked to what doctors charged for that procedure across the country. On further questioning by the trial court, Dr. Heartenstein specifically stated that his opinion that the fees charged by Drs. Butler and Eagle were excessive was arrived at by comparing them to fees charged for the same procedure nationwide, and not with reference to fees charged in York County or the south central Pennsylvania area.

The trial court entered a verdict for the full balance due each doctor, denied post-trial motions and entered judgment. This timely appeal followed.

Appellants raise the following issues:

1. Did Appellants' experts qualify to testify concerning whether or not Appellees' fees were reasonable and customary?

2. Were Appellants' experts entitled to consider evidence of fees charged outside of York County in determining the reasonableness of fees charged by Appellees?

3. Did the Appellees present sufficient evidence of customary and reasonable services?

4. Were fees charged by Appellees reasonable?

Although appellants' statement of the first two issues makes it appear that appellants' expert, Dr. Heartenstein, was not qualified as an expert and was not permitted to testify, in fact Dr. Heartenstein *was* qualified and *did*

testify at length. The substance of his testimony is set forth above. What actually occurred was that the trial court allowed Dr. Heartenstein's testimony without limitation, but reserved the right to determine the weight to be accorded the testimony. Ultimately the court decided that Dr. Heartenstein's testimony was to be accorded no weight in determining the reasonableness of the fees at issue. Appellants are correct in their statement that the standard for qualification as an expert in Pennsylvania is a liberal one, allowing a witness to testify as an expert if he has any reasonable pretension to specialized knowledge on the subject under investigation, *In Re Glosser Bros.*, 382 Pa.Super. 177, 555 A.2d 129 (1989). However, I find that this principle was adhered to in this case inasmuch as Dr. Heartenstein *was* qualified as an expert.

The real issue is whether the trial court erred in ultimately deciding that no weight should be accorded Dr. Heartenstein's testimony. The trial court opined that this testimony was not relevant because Dr. Heartenstein was unable to opine on the unreasonableness of the doctors' fees in relation to other fees charged in the pertinent geographic area. The trial court found that his testimony concerning fees charged in other areas of the country was not probative of the unreasonableness of the fees charged in York County. We must decide whether the trial court erred in exercising its discretion as to how much weight the expert testimony should have been accorded.

The finder of fact is always entitled to evaluate expert testimony and may disregard it entirely. As the Supreme Court has repeatedly indicated, the weight to be accorded expert testimony is to be determined by the jury, or the judge sitting without a jury, according to the fact finder's evaluation of the expert's qualifications and the reasons and facts on which he or she based the opinion expressed. *Smith v. Shaffer*, 511 Pa. 421, 515 A.2d 527 (1986). In the instant case, the trial court's decision to accord no weight to Dr. Heartenstein's testimony was based on the court's perception of the legal standard for determining the reason-

ableness of a doctor's fee. The court opined that the determination of reasonableness must be made, at least in part, by comparing the fee charged to the usual and customary fee for the same service in the geographic area where the particular doctor practices. The court found that the reasonableness of the fee charged was not to be determined by comparing the fee to fees charged in the country as a whole. If this is a correct statement of Pennsylvania law, then the trial court did not err in its assessment of the evidence.

There is surprisingly little Pennsylvania precedent on this question. The most complete statement of principle is found in an old decision by this court in *Husik v. Lever*, 95 Pa.Super. 258 (1928), where the court set forth the law as follows:

In the absence of an express agreement as to amount, the law implies a promise to pay for a physician's services as much as they are reasonably worth. Professional services are worth what they are rated at on the professional market. The physician has his services to sell, the patient agrees to buy them and pay for them the customary price. When the services are properly rendered the patient has received what he has contracted for and has necessarily received legal benefit. Even when the agreement is completely the creation of the law the implied promise is to pay for the services what they are ordinarily worth in the community.

*Id.* at 260.

This statement by the *Husik* court establishes several key principles. The first principle is that a doctor and patient enter into a *contractual* relationship as to payment of a fee for professional services rendered. In a case such as this, and as in *Husik,* one term of that contract is missing. That term is the price term. The parties simply failed to establish the price at the time they entered into their contract. Since they thereafter became involved in a dispute as to the amount owed, the law must supply the missing term. The law does so by implying that the patient

*sub silentio* agreed to pay what the medical services are reasonably worth and the doctor *sub silentio* agreed to accept that amount in full payment. This is presumed to be the intent of both parties. In any event, such a dispute over price is a contractual one and is not to be decided with reference to tort principles regarding determinations of reasonableness.

The second principle established by *Husik* is that the determination of what is reasonable is made by ascertaining the value of the services on the professional market. The relevant market is deemed to be the market for such services in the *community*. The latter presumably refers to the geographic area where the services are performed, since it is presumed that both parties have intended that the price term will be determined with reference to that area. Neither is presumed to have intended that he or she would either pay or receive what might be paid or received at some unspecified distant location. This reasoning assumes a competitive market. So where there are several doctors performing the same service in the immediate geographic area, the reasonableness of the fees will be evaluated on the basis of fees charged in the immediate geographic area. Usually, where only one physician or one group of related physicians perform the service in the immediate geographic area, the reasonableness of the fee charged may be evaluated on the basis of a broader geographic area.

Other cases addressing this subject have also established certain principles that are relevant to our inquiry. Of central importance is the fact that the determination of reasonableness lies well within the discretion of the trial court and we must reverse only for an abuse of that discretion. *McKeehan Estate*, 358 Pa. 548, 57 A.2d 907 (1948). *McKeehan* also instructs us that although the testimony of expert witnesses, i.e. the opinions of other physicians, may well be relevant, they are "... not so conclusive as to take the place of the judgment of the court whose

duty it is to pass on the question of the value of the services." *Id.,* 358 Pa. at 553, 57 A.2d 907.[1]

Lastly, we must remain cognizant that the customary charge in the community is not the only criterion of reasonableness. In *Pfeiffer v. Dyer,* 295 Pa. 306, 145 A. 284 (1929), the Supreme Court emphasized that there must be some flexibility in the fee that will be determined to be reasonable depending on the ability of the particular patient to pay. The Court emphasized the social benefit of allowing a doctor to charge more to a patient who can pay more, so as to enable him or her to render medical assistance and charge less to those less able to pay.

Applying these principles to the case before us, it is clear that the trial court did not commit reversible error in according no weight to Dr. Heartenstein's testimony concerning the issue of reasonableness. As the trial court stated, Dr. Heartenstein did not base his opinion that these fees were excessive on any data concerning fees charged in York County or south central Pennsylvania. He made no attempt to contact other doctors in that locality to ascertain what they would have charged in 1986 for the same services to a patient in the position of Mr. Snyder. Rather, Dr. Heartenstein was only able to testify that his opinion was based on nationwide data concerning the fee to be charged for this procedure. This factual basis for Dr. Heartenstein's opinion completely undermined the value of his opinion because the legal standard established by the foregoing cases requires that reasonableness be determined by reference to what is usual and customary in the community, and not on the basis of what is usual and customary in the nation as a whole. If Dr. Heartenstein had been able to testify as to the fees charged for similar procedures in the counties surrounding York County, then, as the majority

---

1. Although the *McKeehan* court did not specifically comment on the geographic area from which information concerning usual and customary fees is to be drawn, it is noteworthy that in *McKeehan* the services were rendered in the Harrisburg area and the expert witnesses who testified as to their reasonableness were doctors practicing in that area.

states, this evidence would have been clearly relevant. Unfortunately for appellants, their expert was simply not able to provide the trial court with this information.

Despite the majority's lengthy discussion of what it perceives as a recent revolution in the practice of medicine, there was *no* evidence in the instant case indicating that there has been any modification of the manner in which physicians set the fees for their services so as to call upon us to reconsider the standard of reasonableness under existing case law. There is nothing in this record that suggests that there are nationwide fee schedules to which doctors are bound, or that there are not still wide variations in the amounts that may be charged in one locale as opposed to another. In sum, the legal standard is clear and we are aware of no policy argument in favor of modifying it. In any event, we are not free to disregard the mandate of *Husik*, which is a precedential decision of this court and is binding on this panel.

In the third issue posed, appellants argue that appellee Butler & Paul failed to present a prima facie case of reasonableness and, therefore, that the trial court improperly denied appellants' motion for a compulsory nonsuit at the close of Butler & Paul's case.[2] I disagree. Butler & Paul presented the testimony of two witnesses in support of the fee charged. Dr. Butler testified as to what services he performed, the fee charged and the result obtained for the patient. He also described the manner in which he set his fees and confirmed that the fee charged in this case was the same as what he and the doctors with whom he practiced in York County charged other patients for the same services. Ms. Paul, Dr. Butler's billing clerk, testified that normal billing procedures were employed in this case and also

2. Although the majority appears to take no note of this fact, I emphasize that appellants do not even question whether Dr. Eagle presented a prima facie case of reasonableness. Dr. Eagle himself testified in support of his fee and Dr. Cohen, an independent orthopedic surgeon practicing in York County itself, was qualified as an expert and also testified that Dr. Eagle's fee was usual and customary in that area. This is clearly a sufficient showing of reasonableness to establish a prima facie case, which appellants failed to rebut.

stated that the fee charged was Dr. Butler's standard fee for this procedure, plus an additur to account for certain complications involving a bone spur in Mr. Snyder's case.

I regard this testimony as being minimally sufficient to establish a prima facie case under the circumstances of this case. In drawing this conclusion, I remain mindful of the abuse of discretion standard that governs our review of this case and, unlike the majority, accord due deference to the exercise of that discretion by the trial court. The evidence established that this was the usual and customary fee of Dr. Butler and of his associates, all neurosurgeons practicing in York County. Of course, the quality of this evidence is not particularly high given the fact that Dr. Butler and his associates set their fees in unison and are the only neurosurgeons in York County. Thus, the fact that Dr. Butler's associates both would charge the same fee is not particularly telling as to what would be a reasonable fee in this area. Dr. Butler's case would clearly have been strengthened by evidence of fees charged in the geographic area surrounding York County or some other nearby community where other neurosurgeons are practicing.

Nevertheless, against the backdrop of the other evidence in this case, I do not find this to be fatal to Dr. Butler's claim. Importantly, the testimony revealed that the procedure performed on Mr. Snyder was a delicate one, posing a variety of serious risks if not performed correctly and yet highly effective if performed successfully, as it was here. The expertise and abilities of Dr. Butler as a respected neurosurgeon also appear to be beyond question. In addition, as the trial court appeared to recognize, the $2,900 fee charged by Dr. Butler is not facially exorbitant in light of the nature of the services rendered. As I have indicated above, the determination of reasonableness is made upon consideration of many factors, only one of which is the comparison of the fee to other fees charged in the pertinent locale. Considering all of these factors in this case, I find that Butler & Paul did come forward with sufficient evidence to establish a prima facie case of reasonableness.

Appellants' last claim of error is general in nature. They argue that on consideration of all the evidence, the fees charged here were demonstrably excessive. Thus, they contend the trial court abused its discretion. The gravamen of this argument is that both Dr. Eagle and Dr. Butler failed to follow the CPT coding system described above in identifying the services they performed on the bills submitted to Dr. Snyder and, consequently, failed to charge fees for those services in accordance with that coding system. As we have related above in summarizing the testimony at trial, Dr. Henderson and Dr. Heartenstein both testified that the CPT is a compendium of medical procedures to which code numbers are assigned. The CPT also includes certain modifier codes to be used to indicate how a certain procedure was performed, including codes to indicate that the procedure was performed with the assistance of another doctor. Dr. Heartenstein indicated that these modifiers were not used on the bills submitted by Drs. Eagle and Butler to Mr. Snyder and that this resulted in them each billing an amount that would actually have been appropriate only if they each had performed the entire procedure. Drs. Eagle and Butler denied that they had each inappropriately charged for the entire operation.

Unlike the majority, I am not at all persuaded that the failure of Drs. Eagle and Butler to employ the CPT codes and modifiers renders their fees unreasonably high. As the testimony revealed, physicians are neither required by law nor by the standards of any professional organization to use the CPT codes or to bill in accordance with those codes. The CPT is no more than a guide used by medical insurers to identify medical procedures and assign them a value which the insurer will then pay for each procedure. Caterpillar apparently follows this procedure in deciding how much it will reimburse an employee for a particular medical procedure under Caterpillar's self-insurance program.

I do not see how the dictates of the CPT have any relevance to the reasonableness of the fees charged to Mr. Snyder in this case. It must be recalled that the contract in

which we are implying a price term was *not* between these doctors and Caterpillar, the insurer, but rather between these doctors and Mr. Snyder, the patient. It is the understanding, intent and expectation of these parties that is pertinent to our determination of reasonableness, not the understanding, intent, expectation or coding system of Caterpillar. A review of the record reveals that the trial court was fully aware of this fact. This can be seen, for example, in the court's questioning of Mr. Snyder, which proceeded as follows:

By the Court: Having been through it myself, Mr. Snyder, correct me if I'm wrong, I presume when you were talking to the doctors, you figured your insurance company would take care of any costs involved?

Mr. Snyder: That's a hundred percent correct.

By the Court: So you weren't considering the cost, you were considering fixing up your back?

Mr. Snyder: That's very true.

By the Court: All right. Now, if Dr. Butler has said this is a delicate operation, you probably already realized that, and he said we better have another fellow standing there who can help me out and it is a very dangerous operation, I expect you would have said, have him there?

Mr. Snyder: That's correct.

By the Court: And even on afterthought, I expect that's your position?

Mr. Snyder: That's very true.

T.R. at pp. 53–54.

This brief exchange demonstrates that the trial court recognized that it is not the intent or coding system or opinion of reasonableness of Caterpillar that must govern this case. This is a breach of contract action and the contracting parties are Drs. Eagle and Butler and the patient, Mr. Snyder. When these parties contracted for professional services, they all intended that the operation would be performed competently by two highly skilled specialists, which it was, that the operation would cure the patient's medical problem, which it did, and that the patient

would pay the reasonable value thereof. The patient did not question the doctors as to their fee, nor did he question their competent medical advice that two doctors should perform the procedure. Moreover, there is no evidence that any of the parties to this contract intended to be bound by a code system for medical billing used by medical insurers in determining the fees to be charged. Thus, although Caterpillar may use any procedure consistent with the law to determine how it will identify and classify the procedures performed on its insured and how much it will reimburse the insured for those procedures, this has no effect on the legal determination of the reasonableness of the fees charged by the doctors to their patient.

I find no error in the trial court's handling of this case. Rather, I commend the trial court on its practical and principled approach to this matter.

The judgment of the trial court should be affirmed.