832 A.2d 501 (2003)
TEMPLE UNIVERSITY HOSPITAL, INC., Appellee,
v.
HEALTHCARE MANAGEMENT ALTERNATIVES, INC. A/K/A Americhoice of Pennsylvania, Appellant.
Superior Court of Pennsylvania.
Argued December 11, 2002.
Filed September 8, 2003.
*503 Robert C. Heim, Philadelphia, for appellant.
Matthew M. Stickler, Philadelphia, for appellee.
John A. Kane, Harrisburg, amicus curiae.
Before: McEWEN, P.J.E., BOWES and TAMILIA, JJ.
*502 BOWES, J.
¶ 1 Healthcare Management Alternatives, Inc. a/k/a Americhoice of Pennsylvania ("Healthcare") appeals a judgment in the amount of $4,310,494.34 plus pre-judgment interest entered against it in this action instituted by Temple University *504 Hospital (the "Hospital").[1] We reverse and remand for a determination of damages in accordance with this adjudication.
¶ 2 This matter has been before us on a prior occasion. See Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc., 764 A.2d 587, 589-93 (Pa.Super.2000). In that appeal, the Honorable Kate Ford Elliott authored an opinion that comprehensively sets forth the facts necessary for a proper understanding of the matter. We paraphrase those facts as follows.
¶ 3 The Hospital, a teaching hospital, is located in Philadelphia and historically has provided services to individuals who are not able to afford medical care. Most of the Hospital's patients are eligible for Medicaid benefits from the Pennsylvania Department of Public Welfare ("DPW"). The Commonwealth and the United States Government fund the Medicaid program.
¶ 4 Federal law governing Medicaid programs authorizes states to develop their own Medicaid reimbursement standards and methods of payment for hospital services. However, these standards and methods are subject to federal requirements. These requirements include establishing rates that take into account the situation of hospitals that serve a disproportionately high number of low-income patients. The Hospital historically was entitled to additional Medicaid funds because it served a disproportionately large share of indigent patients. Federal constraints also require states to set rates that are reasonable and adequate to meet the necessary costs of an efficiently-operated hospital and to assure that Medicaid patients have reasonable access to inpatient care.
¶ 5 Under the Pennsylvania Medicaid program, which is known as the Medical Assistance Program ("MAP"), DPW, which operates the MAP, traditionally made payments directly to medical providers on a fee-for-service basis. Until 1984, payments were based on actual costs. In 1984, due to spiraling health care costs, DPW established a method of payment that was dependent upon the diagnosis rather than length of stay or number of services provided during that stay. A relative value was placed on a diagnostic related group ("DRG"), and the DRG determined the payment amount. Thus, the patient's diagnosis, rather than the actual services provided, became the touchstone for reimbursement. After 1984, the Hospital remained entitled to additional payments since it served a disproportionately high number of indigent patients. Further, in recognition of its status as a teaching hospital, which increased the costs of care, the Hospital received additional payments to defray capital costs.
¶ 6 In the mid-1980s, pursuant to section 1915(b) of the Social Security Act, 42 U.S.C. § 1396(n)(b), Pennsylvania obtained a waiver from some of the federal Medicaid requirements. This section allowed states flexibility, subject to some limitations, in the development of innovative and more efficient programs to provide medical care to indigent people.
*505 ¶ 7 Under that waiver provision, DPW initiated an experimental program called "HealthPASS." HealthPASS required Medicaid recipients in certain sections of southern and eastern Philadelphia to enroll in a managed care program operated by Healthcare, a for-profit corporation. Healthcare contracted with DPW to provide, among other things, inpatient hospital services to persons in the designated region who were eligible for Medicaid benefits. Thereafter, Healthcare entered into contracts with other health care providers, including the Hospital, who agreed to provide medical services due under the DPW contract. These contracts had to be approved by DPW, which then reimbursed Healthcare for services rendered.
¶ 8 On April 1, 1991, the Hospital entered into a contract with Healthcare to provide services to HealthPASS participants. The contract, which remained in effect until June 30, 1993 provided that the Hospital would be reimbursed at a rate of 114% of the applicable DRG rate. By its terms, the contract remained in effect until June 30, 1993. During this contract period, the Hospital used forms UB-82 and UB-92 to bill Healthcare. Since Healthcare lacked the software necessary to calculate the amount due, the Hospital would write the amount under the remarks section of those forms as a service to Healthcare.
¶ 9 On April 20, 1993, the Hospital notified Healthcare that it would not extend the contract because the payments it was receiving under the contract were inadequate. Thus, when the contract expired on June 30, 1993, the parties began negotiating a new contract. During the course of the negotiations, which lasted until January 1997, the Hospital continued to provide emergency medical services for HealthPASS participants and continued to bill Healthcare for inpatient treatment using UB-82 and UB-92 forms with handwritten billing amounts posted in the remarks section. By letter dated March 24, 1994, the Hospital advised Healthcare that it intended to collect its published rates while the parties were not under contract; Healthcare countered that it would pay the Hospital at its standard rate for out-of-state hospitals, or $705 per day. At that time, the Hospital's medical assistance cost-per-day amounted to $1,204.
¶ 10 When the Hospital indicated that the proposed amount was unacceptable, Healthcare represented that it would pay at the 1991 contract rates. The Hospital again rejected this payment arrangement, demanding payment at its published rates.
¶ 11 During the negotiation period, the Hospital sent Healthcare bills reflecting its published rates as well as the hand-posted DRG rate. Healthcare usually paid the DRG rate but on other occasions, it paid the $705 per diem rate that it set for out-of-area non-contracting providers.
¶ 12 The Hospital instituted this action in December 1997 seeking to recover the difference between published charges and the amount actually paid by Healthcare. After a nonjury trial, the trial court found an implied contract in favor of Healthcare at the 1991 contract rates. The trial court concluded that the Hospital evidenced its intent to accept Healthcare's offer to continue the terms of the 1991 contract when it continued to hand-post the adjusted DRG rates on its bills to Healthcare. The Hospital appealed and we reversed and remanded, finding that the Hospital's actions did not manifest assent to an extension of the 1991 contract and therefore no implied contract existed. Id.
¶ 13 Upon remand, the parties jointly moved to present additional evidence. The motion was granted and hearings were held December 10 and December 11, 2001. Robert Lux, the Vice President, *506 Chief Financial Officer, and Treasurer of Temple University Health System testified that the Hospital was paid eighty percent or more of its full published charges only six percent of the time. In other words, ninety-four percent of the time, the Hospital received less than eighty percent of the Hospital's published rates. Allen Dobson, PhD., Healthcare's expert economist, offered similar testimony. Dr. Dobson estimated that the Hospital was paid its full published charges only one to three percent of the time. Dr. Dobson also testified that the Hospital's data established that, in 1994, its full published rates were 172% of its actual costs and, in 1995 and 1996, the full published charges represented 300% of the Hospital's costs.
¶ 14 After the hearings, the trial court found in favor of the Hospital, concluding that it was entitled to recover under the doctrine of unjust enrichment. The court awarded the Hospital the difference between what Healthcare had paid, which was approximately two million dollars, and the Hospital's published rates. Post-trial motions were filed, and a hearing was held. At that hearing, the court stated that it did not "care whether [the published rates] are reasonable or unreasonable from a commercial point of view" and that it awarded the published rates because they were "not unconscionable," and the court was "not shocked by the amount." N.T., 3/26/02, at 31; see also Trial Court Opinion, 4/10/02, at 12. Healthcare's post trial motions were denied, and this appeal followed. On appeal Healthcare raises the following issues for our consideration:[2]
A. The trial court abused its discretion when it denied HMA's request for post-trial relief and awarded Temple its full published charges on a quasi-contract theory where Temple did not meet its burden of proving that HMA had been unjustly enriched.
B. The trial court committed an error of law when it denied HMA's request for post-trial relief and awarded Temple its full published charges based on its finding that those charges were "not unconscionable" instead of determining the reasonable value of the services provided by Temple as required by Pennsylvania law.
C. The trial court abused its discretion when it denied HMA's request for post-trial relief and awarded Temple its full published charges although the court acknowledged that those charges were "commercially unreasonable."
D. The trial court abused its discretion to the extent it relied on a theory of estoppel in awarding Temple its full published charges where there was no record evidence of detrimental reliance by Temple.
Appellant's brief at i-ii.
¶ 15 Initially, we reiterate our standard of review of a decision rendered by a court sitting in equity. The findings of fact of the equity court will not be disturbed unless they are not supported by the evidence or are demonstrably capricious; however, we may reverse if the equity court committed an error of law or *507 abused its discretion. Daddona v. Thorpe, 749 A.2d 475 (Pa.Super.2000).
¶ 16 Healthcare first contends that the Hospital did not establish the elements of unjust enrichment because Healthcare paid approximately two million dollars for the services rendered. When there is no express contract between the parties, a plaintiff may still recover under a quasi-contract theory. In this situation, a contract is implied by the law:
A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in quantum meruit.

AmeriPro Search Inc. v. Fleming Steel Co., 787 A.2d 988 (Pa.Super.2001) (citations omitted).
¶ 17 Healthcare argues that since the Hospital did not receive a benefit without being paid some value, the elements of unjust enrichment are not present. We disagree. Under the recited principles, we must focus on whether Healthcare has been unjustly enriched and a benefit conferred on it under circumstances that make it inequitable for it to retain the benefit without additional payment. We believe the circumstances herein compel a finding that unjust enrichment has occurred. In reaching this conclusion, we note that the Hospital was compelled under federal law to provide services to individuals covered under the HealthPass program; conversely, Healthcare did not have the ability to prevent its members from seeking emergency treatment at the Hospital. As a result, the parties virtually were compelled to operate in this manner; equitable principles are therefore particularly appropriate to apply.
¶ 18 Healthcare maintains that it adequately compensated the Hospital for services provided during the negotiation period. We disagree. Dr. Dobson testified that Medicaid covered only eighty to eighty-three percent of the costs incurred by hospitals that treat indigent patients. Thus, Healthcare retained a benefit in this instance because it did not pay reasonable value for the services rendered. Accordingly, we find that all of the elements of unjust enrichment were established, see River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc., 2002 WL 31302926 (Tenn.Ct.App.2002) (finding that doctrine of unjust enrichment was applicable where parties were operating under same circumstances presented herein), and that Healthcare's payment of two million dollars did not render the doctrine inapplicable. If we adopted Healthcare's position, entities like Healthcare could pay a fraction of the value of the benefit supplied by health care providers who treat Medicaid recipients and successfully argue that the doctrine of unjust enrichment was not *508 applicable. The very thought of permitting such a result is absurd; payment of less than actual costs in unreasonable and thus, inequitable.
¶ 19 We now address Healthcare's three final contentions, which can be distilled into one essential point: that the trial court did not apply the applicable law in rendering its decision. Healthcare argues that the trial court, rather than determining the reasonable value of the services provided, improperly focused on whether the Hospital's published rates were unconscionable or shocking. We agree. The court erred in awarding the Hospital an amount it deemed to be commercially unreasonable based on its determination that the amount requested was not unconscionable and did not shock its conscience. The decision to award the Hospital its published rates is both inequitable in light of the facts of this case and unwarranted under governing legal principles.
¶ 20 Unjust enrichment is an equitable doctrine, and when unjust enrichment is present, the law implies the existence of a contract requiring the defendant to pay to the plaintiff the reasonable value of the benefit conferred. Mitchell v. Moore, 729 A.2d 1200 (Pa.Super.1999). The crux of our disagreement with the trial court is its determination regarding the value of the benefit conferred. Herein, the trial court improperly focused on the conscionability of the published rates rather than determining whether the published rates were commercially reasonable.
¶ 21 Utilization of the published rates ignores the equities in this case, as well as the realities of the current state of the health care industry and the impact of that reality on the relevant law regarding value conferred in the context of the doctrine of unjust enrichment. First, the importance of the manner in which these two parties were required to operate cannot be ignored. The Hospital was servicing patients because it was required to do so under federal law, and Healthcare could not prevent people covered by its program from going to the Hospital for treatment. Since both parties were legally required to act as they did, commensurately, neither party should be provided a windfall, which is the result reached by the trial court.
¶ 22 Where, as here, there is no express agreement to pay, the law implies a promise to pay a reasonable fee for a health provider's services. Eagle v. Snyder, 412 Pa.Super. 557, 604 A.2d 253 (1992). Thus, in a situation such as this, the defendant should pay for what the services are ordinarily worth in the community. Id. Services are worth what people ordinarily pay for them. Id. Whether the amount charged is unconscionable and whether it shocks the conscience is irrelevant.
¶ 23 While the Hospital's published rates for services may be the same or less than rates at other Philadelphia hospitals, the more important question is what healthcare providers actually receive for those services. As Mr. Lux readily admitted, the Hospital rarely recovers its published rates. Therefore, those rates cannot be considered the value of the benefit conferred because that is not what people in the community ordinarily pay for medical services.
¶ 24 As noted, Mr. Lux testified that ninety-four percent of the time, the Temple University Health System received eighty percent or less of its full published charges. Healthcare's expert economist, Dr. Dobson, testified similarly. He stated that the Hospital was paid its full published charges in only one to three percent of its cases. Courts have also recognized this discrepancy between amounts billed and amounts received under Medicare. See, *509 e.g., Vencor Inc. v. National States Insurance Co., 303 F.3d 1024, 1029 n. 9 (9th Cir.2002) ("It is worth noting that in a world in which patients are covered by Medicare and various other kinds of medical insurance schemes that negotiate rates with providers, providers' supposed ordinary or standard rates may be paid by a small minority of patients."). Dr. Dobson also testified that based on the Hospital's data, the full published charges in 1994 were approximately 172% of its actual costs, while in 1995 and 1996, the published rates were approximately 300% of its actual costs. In addition, Dr. Dobson testified that private payors typically paid 121% of the cost of hospital services in 1994, 119% in 1995, and 112% in 1996. Government payors generally pay less. Mr. Lux acknowledged that the Hospital had twelve contracts with commercial insurance companies and that none of those contracts provided for payment at published rates.
¶ 25 The renowned contracts expert, Dr. John E. Murray, Jr., has explained the remedy applicable when one party has been unjustly enriched at the expense of the other, stating, "To avoid unjust enrichment, the law permits the party who has conferred the benefit to recover the reasonable value of the benefit. Through this action, he is restored to status quo, i.e., he is placed in the position he would have been in if there had been no unjust enrichment." John Edward Murray, Jr., Murray on Contracts § 19, 35 (3rd ed.1990). Since the Hospital would not have been able to recover its published rates from the HealthPASS patients who received medical treatment during the relevant time frame if they were not covered by Healthcare, the trial court's resolution was improper because it failed to restore the status quo.
¶ 26 Instead, the Hospital is placed in an immensely better position than it would have been had the services been performed for the majority of its other patients; in fact, it has been awarded a windfall. Under the law, the Hospital is entitled to the reasonable value of its services, i.e., what people pay for those services, not what the Hospital receives in one to three percent of its cases. Accordingly, the damage award in this unjust enrichment action simply is unwarranted.
¶ 27 In light of the applicable law, the Hospital should be awarded its average collection rate for each year in question. This value would be reasonable. See River Park Hospital Inc., supra (health care provider was awarded the reasonable value of its services, not its published rates, when the health care provider and the payor were operating under circumstances similar to those presented herein).
¶ 28 Furthermore, in light of the facts of this case, we agree with Healthcare's position that the trial court's utilization of an estoppel analysis in awarding the published rates was improper. The trial court indicated that its award was appropriate because the "defendant, knowing it would be charged at retail rate did nothing to control this cost by seeking relief." Trial Court Opinion, 4/10/02, at 8. We reiterate that the Hospital was servicing patients because it was required to do so under applicable law, and Healthcare could not prevent people in its program from seeking services at the Hospital. Since both parties were forced to operate as they did, the court's estoppel analysis was wholly inappropriate.
¶ 29 The Hospital's response to Healthcare's argument hinges primarily upon the manner in which it calculated its published rates, which were designed to offset the shortfall caused by its federal mandate to treat indigent patients. It also *510 focused on how the reduction in published rates were negotiated by health insurers. We acknowledge the factual honesty of its position but note that these facts are not relevant in this case. The law of unjust enrichment, the theory upon which the Hospital rests its right of recovery, does not take these extraneous factors into account. The law permits an award of reasonable fees. Healthcare should not be required to compensate the Hospital for losses incurred as a result of federal requirements and the Hospital's own negotiations with insurers. If the Hospital recovers its published rates in only one to three percent of its cases, those rates clearly do not reflect the amount that members of the community ordinarily pay for medical services.
¶ 30 Alternatively, the Hospital argues that the trial court's holding is not rooted in unjust enrichment but is a third party beneficiary analysis. In support of this claim, it points to language in the trial court's opinion which suggests that the Hospital is a third party beneficiary of the contract between Healthcare and DPW which provided that Healthcare would pay for medical services rendered to its patients. However, conspicuously absent from the contract between Healthcare and DPW is any payment term. The Hospital does not cite any language in the contract between the Commonwealth and Healthcare requiring Healthcare to pay the Hospital's full published rates.
¶ 31 Ironically, the Hospital presently asserts that Healthcare's approach in this action inappropriately requires the courts to function as rate-setting agencies, suggesting that its rates should prevail. Meanwhile, the Hospital instituted this common law action seeking recovery under contractual theories. We determined in the prior appeal that the evidence did not support the existence of an express contract in this case. Thus, the Hospital can recover in this action only under a quasi-contract theory of unjust enrichment. Unjust enrichment permits recovery of the reasonable value of a given service. The Hospital, as plaintiff, has the burden of proving damages to a reasonable degree of certainty in this action. Spang & Co. v. United States Steel Corp., 519 Pa. 14, 545 A.2d 861 (1988). Hence, the Hospital is asking us to become a rate-setting agency, not Healthcare.
¶ 32 The Hospital's contention that it can unilaterally set a price for its services that bears no relationship to the amount typically paid for those service is untenable. Both parties maintain that they are entitled to pay or collect an amount that they subjectively believe to be appropriate and assert that we are bound to accept that amount. We, as an appellate court, are required to apply the law. In the absence of an express contract, the law requires the payment of reasonable value. Reasonable value is what someone normally receives for a given service in the ordinary course of its business from the community that it serves. Eagle, supra.
¶ 33 In accordance with the foregoing, we remand for a hearing so that the Hospital can establish the reasonable value of its services. Reasonable value, in accordance with the above-cited case law, is the value paid by the relevant community. The relevant community in this case comprises the Hospital's patients who are covered by insurance policies and federal programs. Thus, the Hospital should be awarded the average charge for the services at issue contained in contracts with governmental agencies and insurance companies.
¶ 34 Judgment reversed. Case remanded for proceedings consistent with this adjudication. Jurisdiction relinquished.
*511 ¶ 35 Judge Tamilia files a Dissenting Opinion.
DISSENTING OPINION BY TAMILIA, J.
¶ 1 Healthcare Management Alternatives (HMA) appeals the April 10, 2002 judgment in the amount of $4,310,494.34 plus interest from January 31, 1997. The judgment was entered in favor of appellee, Temple University Hospital (Hospital) and against HMA. For the reasons expressed as follows, I respectfully dissent to the majority Opinion and would affirm the judgment of the trial court.
¶ 2 As more fully discussed infra, this case previously has been before this Court, at which time Judge Ford Elliott authored an Opinion thoroughly detailing the facts and procedural history of this case. For purposes of my review of the issues now before us, I rely upon that statement of facts as set forth in Judge Ford Elliott's Opinion.
Temple University Hospital, Inc. ("Hospital") is a teaching hospital located in north Philadelphia, which has historically provided care to indigent individuals despite their inability to pay for care. Many of Hospital's patients are eligible for Medicaid benefits under a program operated by the Pennsylvania Department of Public Welfare ("DPW") and funded jointly by the Commonwealth and the federal government.
Federal law governing Medicaid programs authorizes the states to develop their own Medicaid reimbursement standards and methodologies for payment of hospital services, but subjects those standards and methodologies to three general federal requirements. These requirements include establishing rates that take into account the situation of hospitals serving a disproportionate number of low-income patients. States are also required to find that the rates are reasonable and adequate to meet the necessary costs of an efficiently operated hospital while assuring Medicaid patients reasonable access to inpatient hospital care. States must comply with these requirements to be eligible for federal funds.
Under Pennsylvania's Medicaid program, known as the Medical Assistance Program or "MAP," the DPW makes payments directly to providers of medical services on a "fee for service" basis. Until 1984, MAP through DPW reimbursed hospitals based on their actual costs. In the face of spiraling health care costs, however, in 1984, DPW adopted a prospective payment system. "Under that system, the operating costs of most acute care inpatient hospital stays are reimbursed by a flat payment per discharge that is a multiple of the hospital's payment rate and a relative value assigned to the diagnostic related group (`DRG') into which the particular case falls." Stated differently, in most cases, the patient's diagnosis determined what DPW would pay, rather than the length of the patient's stay in the hospital or the intensity of the care received there. Certain hospitals, such as Hospital in this case, were, however, still entitled to additional payments because they served a disproportionate share of indigent patients. Hospital also received additional payments to defray capital costs and in recognition of its status as a teaching hospital, for which the cost of providing medical care is higher than at a community hospital.
...
In the mid-1980's, pursuant to § 1915(b) of the Social Security Act, 42 U.S.C. § 1396(n)(b), Pennsylvania obtained a waiver from some of the federal Medicaid program requirements. Section *512 1915(b), as interpreted at that time by the federal agency responsible for approving waivers, allowed states flexibility, subject to certain limitations, in developing innovative, cost-effective, and efficient programs for providing care to indigent populations while maintaining access to and quality of care for those populations.
Pursuant to the waiver provision, DPW instituted an experimental program known as "HealthPASS" under which Medicaid recipients in certain sections of southern and western Philadelphia were required to enroll in a Medicaid managed care company. The managed care company, appellee Healthcare Management Alternatives, Inc. ("HMA"), contracted with DPW to provide inter alia, in-patient hospital services to persons in the targeted region who were eligible for Medicaid. HMA did not, however, provide medical services directly; rather, it entered into contracts with various health care providers, including Hospital, to provide such services. These contracts were subject to DPW approval.
The contract between HMA and DPW described HMA as a "health insuring organization" ("HIO"), defined as an entity which assumes an underwriting risk to pay for medical services provided to recipients in exchange for a premium or subscription charge paid by the state agency. DPW therefore agreed to pay HMA a "capitation payment," defined as a monthly payment for each recipient enrolled under the contract at the rates specified by the contract. While recognizing that DPW was responsible for prudently spending state and federal funds, the contract also recognized that HMA was a for-profit corporation. As a result, the contract provided a system of either refunds or credits under certain specific circumstances. As HMA's chief witness testified, however, "HMA made money by spending less than it received from DPW. The focus of the HIO was basically to try to control or limit some hospitalizations and pass that money onto the other providers." (Testimony of Richard Braksator, 3/16/99, at 6, R.R. at 1632a).
Pursuant to HMA's contract with DPW, HMA entered into a contract with Hospital in 1991 to provide services to HealthPASS participants. According to Mr. Braksator, the terms of such contracts were set by negotiation. In the April 1, 1991 contract, Hospital agreed, inter alia, to provide inpatient hospital services to Medicaid recipients in the HealthPASS region in consideration for which HMA would pay Hospital at a rate of 114% of the relevant DRG rate. (R.R. at 99a.) By its terms, the contract remained in effect until June 30, 1993. During the contract period, Hospital would handwrite the applicable amount due under the contract for inpatient hospital care in the "Remarks" section of forms UB-82 and UB-92, the forms Hospital used to bill HMA. Hospital provided this service for the benefit of HMA, which lacked the computer software necessary to calculate the amount. (Testimony of Richard Braksator, 3/16/99, at 13, R.R. at 1639a.)
By letter dated April 20, 1993, Hospital informed HMA of its intent to re-negotiate its existing arrangement with HMA. As the trial court found, "[Hospital] advised HMA by letter that it wished to renegotiate its payment arrangement with HMA and did not wish to extend the current contract. [Hospital] had concluded that HMA's payments were no longer adequate." (Trial Court Opinion, 4/23/99, at 3, finding of fact 13, citing Hospital's Exhibit 4 and Lux testimony at 90-94.) Nevertheless, after *513 the contract expired in June of 1993 and through the period in controversy, until 1997, Hospital continued to hand-post the adjusted DRG rate on the UB-82's and UB-92's it submitted to HMA for payment.
During the period in dispute, however, specifically in March and April of 1994, the parties exchanged several letters. In the first letter, dated March 15, 1994, HMA indicated that it had previously extended the prior rate arrangements in anticipation of receiving Hospital's proposal to renew its participation with HMA. (R.R. at 102a.) HMA concluded by indicating that it "will reimburse [Hospital] at the out of area rate paid to all non-contracted facilities."6
Hospital responded by letter dated March 24, 1994, in which Herbert White, the Hospital agent to whom HMA's March 15th letter had been directed, indicated dismay with HMA's March 15th letter for two reasons: first, because Hospital had previously made it clear that it intended to bill and collect its published charges from all non-contracted third-party payers such as HMA; and second, because Hospital had never agreed to extend the previous agreement. HMA answered by letter dated April 8, 1994, in which it acknowledged that Hospital considered the expired rate agreement no longer valid. The April 8, 1994 letter also indicated that because Hospital was negotiating in good faith, HMA was willing to leave the expired rate in effect until negotiations were complete; otherwise, it would reimburse Hospital at the rate of $ 705 per diem. Hospital replied by letter dated April 26, 1994, flatly rejecting the out-of-area rate and reiterating its position that "to the extent that a future agreement results in a contractual gap in our relationship, [Hospital] will expect payment at full charges for any services provided during that gap."7
During the period from January 1, 1994 to January 31, 1997, Hospital submitted hundreds of claims to HMA for payment.8 Each claim itemized Hospital's published charges for each service provided, and also included the hand-posted DRG code and corresponding adjusted DRG rate in the "Remarks" section. (See R.R., vol. 2 at 478a-928a.) HMA paid the amount written in the "Remarks" section for most of these claims, but only paid the $ 705 per diem rate set for out-of-area non-contracting providers for others. (Braksator testimony, 3/16/99 at 42, R.R. at 1668a.) In December 1997, when HMA refused to reimburse Hospital for the difference between what HMA had paid and Hospital's published charges for these claims, Hospital brought suit, alleging that "the surrounding circumstances, the ordinary course of dealing and the common understanding within the hospital and health care industry created an implied contract between HMA and [Hospital] for the payment of [Hospital's] reasonable charges as set forth in [Hospital's] bills ...."9
Following a non-jury trial, the trial court found an implied contract in favor of HMA, stating that Hospital evidenced its intent to accept HMA's offer to continue the terms of the 1991 contract when it wrote the DRG amounts in the "Remarks" portion of the UB-82's and UB-92's. (Trial Court Opinion, 4/23/99, at 6-7.) The trial court further concluded that Hospital, by asking for full payment for services rendered, "is asking this court to circumvent the base DRG Medicaid rates set by DPW and mandated by federal law. As the law does not violate the constitution, this court cannot and will not presume to act as a legislature." (Id. at 7.)

*514 ...
The parties agree that the written 1991 contract had expired by its terms on June 30, 1993. (See Lux testimony, 3/15/99, at 113, R.R. at 1452a; Braksator testimony, 3/16/99, at 18, R.R. at 1644a.) Furthermore, neither party avers the existence of an oral contract. As a result, during the relevant time period, if a contract existed at all, its existence was premised on the parties' conduct.
In this case, it is undisputed that HMA offered in writing to extend the terms of the 1991 contract until the parties reached an agreement as to the terms of a new contract. It is also undisputed that the parties continued to engage in a course of conduct similar to that established by their prior agreement: Hospital provided medical services to HealthPASS participants and submitted forms UB-82 and UB-92 reflecting both its published charges and the adjusted DRG rate. HMA then paid for Hospital's services, most frequently basing its payments on the hand-written adjusted DRG rate, which was calculated using the base DRG rate for Hospital prior to July 1, 1993, but sometimes paying the $ 705 per diem rate. This course of conduct continued from June 30, 1993 through January 31, 1997.
6 This rate amounted to $ 705 per diem, well below Hospital's medical assistance cost-per-day of $ 1,204.
7 The parties apparently negotiated a new contract in January 1997, when the Health-PASS program ended. Mr. Braksator did not know whether the subject of retroactivity arose during contract negotiations because he was not a party to those negotiations.
8 Hospital's complaint sets the number at more than 250; however, the record contains more than 450 claims.
9 The trial court found that Hospital established its published rates, which were equivalent to or lower than the rates of other Philadelphia hospitals, after considering what other hospitals were charging for similar services.
Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc., 764 A.2d 587, 589-593 (Pa.Super.2000) (internal footnotes at conclusion of text.)
¶ 3 Finding Hospital's actions did not manifest assent to extension of the 1991 contract and that no implied contract existed between the parties, this Court reversed and remanded the case. Evidentiary hearings were conducted on December 10 and 11, 2001. Thereafter, the trial court determined that Hospital was entitled to receive payment at its published rates, based upon a common law theory of contract law.
¶ 4 HMA appeals and raises the following questions for our review.
1. Whether the trial court abused its discretion when it denied HMA's request for post-trial relief and awarded Temple its full published charges on a quasi-contract theory where Temple did not meet its burden of proving that HMA had been unjustly enriched considering that HMA had paid Temple $2 million for the services provided.
2. Whether the trial court committed an error of law when it denied HMA's request for post-trial relief and awarded Temple its full published charges based on its finding that those charges were "not unconscionable" instead of determining the reasonable value of the services provided by Temple as required by Pennsylvania law.
3. Whether the trial court abused its discretion when it denied HMA's request for post-trial relief and awarded Temple its full published charges although the court acknowledged *515 that full published charges were "commercially unreasonable."
4. Whether the trial court abused its discretion to the extent it relied on a theory of estoppel in awarding Temple its full published charges where there was no record evidence of detrimental reliance by Temple.
(Appellant's brief at 3.)
The role of an appellate court in reviewing the trial court's final judgment is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Furthermore, the findings of the trial judge in a nonjury case must be given the same weight as a jury verdict and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and, conversely, all unfavorable inferences rejected.
Tagliati v. Nationwide Ins. Co., 720 A.2d 1051, 1052-1053 (Pa.Super.1998), appeal denied, 559 Pa. 706, 740 A.2d 234, (1999), quoting Romano v. Nationwide Mutual Fire Insurance Co., 435 Pa.Super. 545, 646 A.2d 1228, 1231 (1994) (citations omitted).
¶ 5 While this Court in Temple I reached a different conclusion of law than the trial court, holding no implied contract existed, we left relatively untouched the findings of fact which drive the resolution of this case, Temple II. In determining the outcome of Temple II, the trial judge relied on common law principles of contract, which are broad enough to incorporate the concepts of quasi-contract and include the element of unjust enrichment.
¶ 6 Upon review of the record,[3] it is clear that the disposition of this matter must be guided by the principles pertaining to a quasi-contract.
A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. The elements of unjust enrichment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in quantum meruit.

AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa.Super.2001) (internal citations omitted.)
¶ 7 Contrary to HMA's argument Hospital failed to establish that it was unjustly enriched, I find the benefit received by HMA to be well documented in the record. During the time in question, and despite the expiration of the 1991 written contract with HMA, Hospital continued to treat HealthPASS participants as it is required *516 to do pursuant to the Emergency Medical Treatment and Active Labor Act, 42 USCS § 1395dd. The record supports the trial court's finding, "HMA was a fiscal intermediary for federal Medicaid funds that was administered by the Commonwealth of Pennsylvania Department of Public Welfare. The HealthPASS program placed Medicaid patients in an HMO program whereby intermediaries paid for their hospital treatment. Thus, [Hospital] was a third-party beneficiary of the contract for care between the HMO and the Medicaid recipient." Trial Court Opinion, Cohen, J., 4/10/02, at 7.
¶ 8 Further, I believe the evidence fully supports the trial court's conclusion Hospital was entitled to request payment at the rate of its published charges. The evidence supports the conclusion Hospital's published rate is the same or less than other Philadelphia hospitals. Moreover, there was no credible evidence presented to suggest the published rate was unconscionable, and there is no language in the applicable federal or state legislation that prohibits Hospital, under the circumstances of this case, from charging its published rates. In the absence of a contract with HMA, which serves as the intermediary between DPW and the hospitals and has a stated goal of minimizing Medicaid payment to providers which can be accomplished only by good faith negotiation with said providers, Hospital had no recourse but to rely upon its published charge. As stated in the briefs of the parties, and adopted by this Court in both its prior and present Opinions, hospitals have no choice under federal and state law but to accept indigents in emergency care and, to the extent they treat such patients without reasonable compensation, the burden is thrust upon paying patients or insurers under non-government programs to assume the cost of that care. When hospitals are required to enter into non-compensatory or inadequately compensated treatment, their ability to service the community will sooner or later be eliminated through bankruptcy, merger with a more productive cost effective institution, or reliance on a non-contractual modality, as here, where Hospital's established published rates are based on the community standard and are equivalent to rates equal or lower than the rates charged by other Philadelphia hospitals. See Temple I, Statement of Facts, footnote 9. HMA's negotiated rates may only substitute for published rates if they are negotiated fairly, with reasonable payment to Hospital, rather than being imposed arbitrarily.
¶ 9 HMA argues the trial court erred in evaluating the appropriateness of the charges based upon an analysis of whether the charges were unconscionable. HMA maintains that this matter requires application of a "reasonable value" standard.
¶ 10 A "reasonable value standard" may be the only yardstick by which programs such as HMA and HealthPASS can prudently assign a cost for services provided. This remains true despite the cost effectiveness of such programs to taxpayers, government entities and institutions. What constitutes a "reasonable value," however, while a matter of much debate among medical care providers and commercial health insuring organizations, is a matter not to be decided by this Court.[4]
"In the absence of an express agreement as to amount, the law implies a promise to pay for a physician's services as much *517 as they are reasonably worth. Professional services are worth what they are rated at on the professional market. The physician has his services to sell, the patient agrees to buy them and pay for them the customary price. When the services are properly rendered the patient has received what he has contracted for and has necessarily received legal benefit. Even when the agreement is completely the creation of the law the implied promise is to pay for the services what they are ordinarily worth in the community."
Eagle v. Snyder, 412 Pa.Super. 557, 604 A.2d 253, 259 (1992), quoting Husik v. Lever, 95 Pa.Super. 258, 260, 1929 Pa.Super. LEXIS 24, **3 (Pa.Super.1929) (emphasis added.)
¶ 11 The trial court, as the fact finder, reviewed Hospital's published rates and found the evidence supported the finding that HMA's payment of the published rates would not cause it any undue hardship. As clear example of the disparity between payment proposed by HMA in relation to Hospital's medical assistance cost per day, we need only look to footnote 6 of Temple I, wherein it states Hospital would be reimbursed $705 per diem, well below Hospital's medical assistance cost per day of $1,204a disparity of 58.5%. Hospital could not survive financially if this rule were imposed across the board. While Hospital might have an advantage by refusing to enter into a contract, HMA has the definite advantage in negotiations due to the imposition of the law requiring Hospital to treat indigent patients at whatever rate it can negotiate or, in the alternative, free of charge. I find no support for HMA's argument that payment of the published rates would cause it undue hardship.
¶ 12 Contrary to what HMA and DPW argue, I believe in this case the denial of payment based upon published rates will be destructive of the HMA-HIO/DPW system of regulating hospital costs while assuring adequate emergency and other hospital care for Medicaid and indigent persons. The denial to hospitals of a fair return by HMA/DPW under a "reasonable basis contract," while hospitals remain compelled under law to accept such indigent patients, will assure the demise of the system of hospitals in this country, and result in unjust enrichment to HMAs and the perversion of federal regulation governing this area of Medicaid law.
¶ 13 Based upon the foregoing, I would affirm the April 10, 2002 judgment in the amount of $4,310,494.34 plus interest from January 31, 1997.
NOTES
[1] Having determined that the majority of the original record was misplaced prior to the time for filing the certified record with this Court, this Court questioned the parties at oral argument with respect to the missing record. Conceding that the original record was lost and choosing not to have the trial court reconstruct the original record, the parties agreed to this Court's reliance upon the documents contained within the Reproduced Record for purposes of this appeal. Accordingly, the certified record in this case shall be comprised of the following: the small portion of the original record filed with this Court (Part I) and Volumes 1-4 of the Reproduced Record (now, Parts II-V of the certified record).
[2] DPW has filed an amicus curiae brief in support of Healthcare. In that brief, DPW has raised issues that were not raised by Healthcare. These contentions are not properly before us for resolution. "An amicus curiae is not a party and cannot raise issues that have not been raised or preserved by the parties. See Pa. R.A.P. 531(a) (amicus curiae may file brief regarding only those questions that are before the Court)." Commonwealth v. Tharp, 562 Pa. 231, 236 n. 5, 754 A.2d 1251, 1254 n. 5 (2000).
[3] See footnote one (1), majority Opinion.
[4] The majority's second remand of this case to establish "reasonable value" as a non-negotiated determination is totally beyond the capacity of the trial court. See Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc., 764 A.2d 587, 592 n. 9 (Pa.Super.2000).