J-A08018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TREES IN TRAVEL, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICHOLAS C. ADAMS, DEBORAH S. | : | |
| ADAMS, MONKHOUSE, LLC, AND | : | |
| 1029 BLACK ROCK, LLC | : | No. 1300 EDA 2020 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered June 15, 2020
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): No. 2016-02929

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED:  May 10, 2021**

Nicholas C. and Deborah S. Adams, husband and wife, Monkhouse, LLC and 1029 Black Rock, LLC (collectively, Appellants) appeal from the judgment entered against them and in favor of Trees in Travel, LLC (TNT).  We affirm.

Despite the voluminous record (more than 6,300 pages excluding transcripts), 16-day bench trial (including testimony from no less than 6 experts), and millions of dollars expended, this appeal, at its essence, concerns a fee dispute between a retail client, Appellants, and their landscaping company, TNT.

_____

[*] Former Justice specially assigned to the Superior Court.

Following trial, the court authored a 76-page decision; in response to this appeal, it issued a 40-page Rule 1925(a) opinion. *See* Trial Court Opinion, 2/21/20, at 1-76; Trial Court Opinion, 8/24/20, at 1-40. In the latter, the court recounted the following:

> [TNT] is a limited liability company. . . . Douglas and Constance Herrmann [Mr. Herrmann Ms. Herrmann or the Herrmanns] are the sole members and equal co-owners of TNT. Nicholas and Deborah Adams [Appellants or Mr. Adams Ms. Adams the Adams] are husband and wife, residing at all times relevant at 1500 Monk Road, Gladwyne, PA 19035 (hereinafter "the Monk Property"). Defendant Monkhouse, LLC and Defendant 1029 Black Rock, LLC are limited liability companies. Monkhouse, LLC owns the Monk Property at 1500 Monk Road, Gladwyne, PA, while 1029 Black Rock, LLC owns the property located at 1029 Black Rock Road, Gladwyne, PA. Nicholas Adams is the sole member of both LLCs.
>
> Prior to the work at issue in the instant matter, TNT and the Adams entered into an agreement for tree removal work, pursuant to a written proposal dated July 8, 2009. The Adams subsequently hired TNT to perform additional landscaping work over the course of the next seventeen (17) months, through January 2011. The Herrmanns testified that during these months of work, the parties established a course of dealing in which there was no requirement for a written scope of work, no request for rates for labor, equipment, or materials in advance of work, and no requirement for interim invoicing, yet the Adams paid invoices even when they were received months after completion of the work. During this period, the scope of work expanded pursuant to a series of verbal and email requests by the Adams and their property manager, Ray Starzmann.
>
> On or about March 2, 2011, TNT submitted a "Preliminary Landscape Estimate" (hereinafter "Preliminary Estimate") to the Adams for landscape services based on a plan designed by Simone Collins Landscape Architecture. The Preliminary Estimate proposed a design with 27 "specimen extra large trees," 51 "specimen large trees," 508 shrubs, 4,262 perennials, and approximately 4,000 bulbs and provided that a "TWO YEAR full replacement guarantee will apply for each tree." The Preliminary Estimate stated that the installation would take place over the

course of 2011, potentially continuing into spring of 2012. The Preliminary Estimate provided a fixed, lump sum price of $1,287,500 but stated that the Adams could opt to instead select a "non-traditional" approach where landscape installation would take place on a "time and materials basis." Ms. Adams accepted TNT's Preliminary Estimate when she signed the last page of the document and returned it to TNT with a deposit of $200,000. However, the Adams did not specify whether they wanted to proceed with the fixed price option or the time and materials option. Ms. Adams sent an email to the Adams' property manager at the time, Ray Starzmann, stating that this check was "for [TNT] to get started" with the work.

* * *

TNT performed work at the Monk Property from March 2011 until the Adams suspended them on February 25, 2015. TNT had never taken on a project bigger than the project at the Monk Property, either in terms of cost or in terms of the number of trees and plants involved. TNT's scope of work expanded "significantly" beyond the work proposed in the Preliminary Estimate. In particular, TNT's work expanded as they received updated plans and plant lists from landscape architect Sarah Leeper of Simone Collins and new plant selections from Mr. Adams. TNT's work also expanded to include providing support for construction-related services—in the form of labor, equipment, and materials—to other contractors working at the Monk Property.

* * *

TNT did not provide any change orders as the scope of work expanded, instead billing as work was performed. As for construction-related services, TNT did not provide any written contract or change order for any services, in advance of the scope of work expanding—consistent with the parties' prior course of dealing, the Adams accepted TNT's work. The Adams frequently praised TNT.

On August 13, 2014, the Adams' [other] property manager, Joe Rizzo, requested that TNT perform landscaping services at the property located at 1029 Black Rock Road, Gladwyne, PA—including weeding, mulching, pruning, and removal of green ivy. In this email request, Mr. Rizzo requested that a separate invoice for this work be provided to the Adams. The Adams were copied

as recipients on this email. TNT submitted its billing for work done at the 1029 Black Rock Road property in a separate invoice as requested, sending Invoice #432 to Mr. Rizzo on February 25, 2015, for a total amount of $5,038.21. Mr. Rizzo forwarded this invoice to Ms. Adams, who responded by asking whether the amount seemed reasonable and whether they had already paid for the work. Mr. Rizzo replied saying that the invoice "seems reasonable" and confirming that the Adams had not yet paid for the work at 1029 Black Rock Road. After this exchange, Ms. Adams emailed Mr. Rizzo saying "I will send (TNT) a check for this." Thereafter, Mr. Rizzo emailed Ms. Herrmann saying "you will be receiving payment for the Black Rock Road invoice." A check was prepared and sent to TNT for work done at 1029 Black Rock Road, but subsequently, Defendant 1029 Black Rock LLC stopped payment on that check.

During the period from March 2, 2011 through February 18, 2012, TNT issued eight accountings requesting payment from the Adams. Each accounting noted that it did not include "labor, equipment, dump tracks, dumpster and disposal fees, storage fees and materials as directed by Ray Starzmann..." Ms. Herrmann testified that the purpose of such a notation was to make it clear that the accountings were not meant to be inclusive of all work performed. The accountings did not disclose rates for labor, equipment, material markups, or otherwise explain how work beyond the scope of the original Preliminary Estimate might be charged. However, despite lack of rates or more detailed invoicing, the Adams continued to pay hundreds of thousands of dollars in progress payments to TNT, without insisting on receiving additional accountings or invoices.

Over the years, the Adams made a handful of other requests for more detailed invoicing. The Herrmanns testified that they struggled to provide the Adams with detailed invoicing due to TNT's lack of a sophisticated project cost accounting system, the ever-expanding scope of the project, and Ms. Herrmann's struggles with Lyme disease. Still, as testified by Mr. Adams, not once did the Adams order TNT to stop performing work prior to February 25, 2015. On December 13, 2012, Mr. Starzmann asked TNT whether "the monies you have been paid bring you current?" TNT responded "[t]he answer to your question is that we are current, for the most part." Ms. Herrmann testified that TNT's assessment that the Adams were current "for the most part" was

based on a "rough analysis" performed in one day, in advance of a budget meeting to be held two days later.

TNT made its last request for a progress payment in October 2014 in the amount of $300,000, explaining that the payment was "so we can continue to stay current." Ms. Herrmann testified that staying "current" as written in this email referred to payment of $300,000 being enough for TNT to be able to stay current in paying its own vendors and subcontractors — not the currency of the Adams' payments to TNT. Ms. Adams testified that other than TNT's email of October 16, 2014, she could not recall if there existed any other written document in which TNT indicated that the Adams' account was current. In January 2015, the Adams asked TNT to begin submitting monthly invoices, starting with an invoice for January 2015. Ms. Adams testified that this was the first time she had asked TNT to provide a monthly invoice. TNT complied with this request, submitting the January 2015 Invoice #431 in an email to Mr. Rizzo, which totaled $38,551.42 and included TNT's labor rates. Mr. Rizzo forwarded the January 2015 invoice to Ms. Adams, who responded "I have no idea where we stand with payments with them." Ms. Adams testified that she did not look at the January 2015 invoice, instead passing it off to Mr. Rizzo to review upon receipt.

On February 25, 2015, TNT submitted its Closeout Invoice seeking payment of $2,802,902.78 in addition to the $3,907,500 the Adams had paid to TNT until that point — bringing the total value of work performed at the Monk Property as estimated by TNT to $6,710,420.78. The Adams responded to the email with the Closeout Invoice, saying they would review the invoices that evening. Mr. Adams testified that he and Ms. Adams felt "shocked" and "scammed" by the Closeout Invoice. On February 25, 2015, Mr. Rizzo sent an email to the Herrmanns, informing them that TNT's services at the Monk Property were suspended. After terminating TNT, the Adams retained Stillwater Landscaping for services in the interim period before they could assemble their own in-house crew. . . .

The Court conducted a sixteen-day bench trial on June 3 to June 4, 2019, July 31 to August 9, 2019, September 3 to September 6, 2019, and September 18 to September 19, 2019. At trial, both parties made a case as to what the reasonable value of TNT's services was. The Adams' estimation of reasonable value was based on a report by James Gallagher of Resolution Management

- 5 -

Consultants (RMC). Mr. Gallagher reviewed TNT's records to determine the actual costs incurred to perform the work, then applied a 20% markup for self-performed labor, equipment, and materials and a 5% markup for subcontracted labor—concluding that reasonable value was $2,940,480.90. Because the Adams had already paid TNT $3,907,500, Mr. Gallagher's reasonable value estimate was $967,019.10 less than the total amount in progress payments the Adams made to TNT. Mr. Gallagher identified a total of $244,946.37 in "improper charges," a full discussion of which is found in the Court's Decision at pp. 26-28. The Court credited most of Mr. Gallagher's conclusions as to improper labor charges and found excess labor charges totaled $308,353.96.

Contrary to the Adams, TNT did not adopt the position that actual costs plus reasonable overhead and profit constituted reasonable value. To value TNT's specimen plants, TNT called Mr. Brooks, Mr. LaHoff, and Mr. Stanek — all qualified experts on valuation of rare specimen plants with many years of experience in the landscaping industry. Mr. Brooks described some plants provided by TNT to the Adams as being "of super specimen" quality, "spectacular," and "unbelievable," with some being the type of plants one would see only "once in a lifetime" given their age and rarity. Mr. LaHoff also testified to the rarity of the plants, explaining that only a "handful" of growers in the country would be able to offer them and that finding the plants TNT provided would be difficult without "connections." Mr. Stanek testified to the rarity of the plants supplied to the Adams by TNT, calling some trees "one of a kind," "unique," or like "a piece of art." All three experts testified that their estimates are what a member of the consuming public would ordinarily have to pay. When asked whether he determined whether there exists a nursery dealer from which a consumer like the Adams could actually purchase a particular specimen tree for the price he valued it at, Mr. Gallagher testified that he made no such inquiry.

As for valuation of TNT's labor, equipment, and materials, TNT offered Paul Pocalyko and Rocco Vespe from the consulting practice HKA, Global, Inc. as experts. In total, Mr. Pocalyko and Mr. Vespe estimated the Adams owed TNT a remaining balance of either $3,100,148 or $3,398,590. Similar to the Adams' expert, HKA also identified a number of erroneous charges in TNT's Closeout Invoice, which the [c]ourt credited. A breakdown of how HKA calculated reasonable value is found in the [c]ourt's Decision.

J-A08018-21

Following receipt of Proposed Findings of Fact and Conclusions of Law, this [c]ourt determined that judgment should be entered in favor of [TNT] and against [Appellants] for breach of implied contract, or in the alternative, unjust enrichment, in the amount of $1,497,413 for the reasonable value of TNT's unpaid trees, labor, equipment, and materials related to work at 1500 Monk Road, and $5,038.21 for same at 1029 Black Rock Road.  The [c]ourt further ordered that judgment should be entered in favor of [TNT] and against [Appellants on their counterclaims] Thereafter, [Appellants] filed a Motion for Post-Trial Relief, and [TNT] filed a Motion to Mold the [c]ourt's Decision and Judgment to Include Pre-Judgment Interest.  The [c]ourt issued an order granting [TNT's] motion only as to the request to mold the verdict to add post-judgment interest, denying the request to mold the verdict to add pre-judgment interest.  The [c]ourt issued a Memorandum Opinion-Order for [Appellants'] Motion for Post-Trial Relief, granting the motion as to the request that the [c]ourt vacate its award of prejudgment interest and denying the remainder of the requested relief.

[Appellants] filed a timely Notice of Appeal on June 22, 2020.

Trial Court Opinion, 8/24/20, at 1-11 (record citations and footnotes omitted).

Appellants and the trial court subsequently complied with Pennsylvania Rule of Appellate Procedure 1925.[1]  Appellants present four questions for our review:[2]

_____

[1] Appellants' 6-page, 24-issue Rule 1925(b) concise statement is not concise, and there is case law which would support a finding of waiver.  *See Jiricko v. Geico Ins. Co.*, 947 A.2d 206, 210 (Pa. Super. 2008) (finding waiver appropriate where appellant filed five-page incoherent statement of errors); *see also Kanter v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004).  However, as the trial court has attempted to address Appellants' myriad claims, we decline to find waiver and likewise review Appellants' issues.

[2] Appellants timely filed their brief on October 6, 2020.  On December 14, 2020, without seeking leave of Court, Appellants filed what they titled a
*(Footnote Continued Next Page)*

1. Did the trial court err in awarding [TNT] *quantum meruit* damages of $1,497,413 beyond the $3,907,500 in progress payments requested by [TNT] and paid by Appellants for landscaping and construction services in 2011-2014, where [TNT] represented that the progress payments were bringing [Appellants'] account current, and where [TNT] nevertheless "re-priced" its services after all work was done in February 2015, in an attempt to charge Appellants an additional $2,802,920, all of which represented excess profits?

2. Did the trial court err in adopting the labor rates and tree/shrub/conifer charges in [TNT's] February 2015 Invoice as representing "reasonable value" despite [TNT's] failure to adduce any specific evidence that any other customer ever paid [TNT] comparable rates or charges, contrary to ***Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.***, 832 A.2d 501 (Pa. Super. Ct. 2003)?

3. Did the trial court err by declining to measure "reasonable value" consistent with construction/landscaping industry standards, where contractors are ordinarily paid their actual cost plus a reasonable allowance for overhead and profit for services provided beyond the scope of a fixed price contract?

4. Did the trial court's award result in an impermissible windfall recovery for TNT, where it was based on a 97.1% mark-up ($2,664,028) over TNT's actual costs of $2,740,884.99, which far exceeded standard industry markups of no more than 20% for projects of comparable scale performed on a time and materials basis?

Appellants' Brief at 2-3.[3]

_____

"Definitive Copy" of their brief. Appellants cite no authority for the December 14, 2020 filing, which we decline to consider. Our references to Appellants' brief are to the October 6, 2020 filing.

[3] Contrary to the Rules of Appellate Procedure, Appellants' argument is divided into three issues, rather than the four enumerated in their statement of questions presented. The first issue has two subparts, and the second issue has six subparts which conflate the second and third issues. ***See*** Appellant's
*(Footnote Continued Next Page)*

Appellants first argue the trial court erred in awarding damages to TNT because: (1) the "award was contrary to the expectations of the parties given the 'surrounding circumstances' governing the implied-in-fact contract"; and (2) TNT's claim for relief "should have been barred by the Unclean Hands Doctrine given TNT's improper and unscrupulous conduct." Appellants' Brief at 33, 38 (unnecessary capitalization omitted).

> Pertinently:
>
> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

*Metro Real Estate Investment, LLC v. Bembry*, 207 A.3d 336, 339 (Pa. Super. 2019) (citations omitted). The "credibility of witnesses is an issue to be determined by the trier of fact. On appeal, this Court will not revisit the trial court's determinations regarding the credibility of the parties." *Garwood v. Ameriprise Financial, Inc.*, 240 A.3d 945, 948 (Pa. Super. 2020) (citations omitted).

---

Brief at 32-60; *see also* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued.").

However, with respect to contract claims:

> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.

**Gillard v. Martin**, 13 A.3d 482, 487 (Pa. Super. 2010).

Lastly, "[*q*]*uantum meruit* is an equitable remedy to provide restitution for unjust enrichment in the amount of the reasonable value of services." **Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.**, 2 A.3d 526, 532 n.8 (Pa. 2010) (citation omitted).

> Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. The elements necessary to prove unjust enrichment are:
>
> > (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

**Mitchell v. Moore**, 729 A.2d 1200, 1203–04 (Pa. Super. 1999) (citations omitted).

Instantly, Appellants do not articulate any error of law by the trial court in finding unjust enrichment; instead, viewing the evidence in the light most

- 10 -

favorable to themselves, they challenge the trial court's interpretation of their dealings with TNT and its determination as to damages. Appellants' Brief at 33-38. In other words, rather than present a cogent legal argument, Appellants assail the trial court's findings of fact, and attempt to retry their case on appeal. We emphasize,

> our scope of review . . . is very limited. We will respect the trial court's findings with regard to credibility and weight of the evidence unless it can be shown that the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence.

**Hollock v. Erie Ins. Exch.**, 842 A.2d 409, 417 (Pa. Super. 2004) (*en banc*).

In its 76-page decision, the trial court cited both testimonial and documentary evidence in explaining how its findings aligned with the parties' prior dealings. The court additionally explained its calculations of damages, and in particular, why it did not credit Appellants' claims that they had paid TNT in full. Trial Court Opinion, 2/21/20, at 30-59; **see also** Trial Court Opinion, 8/24/20, at 15-21, 32-33. As the record supports the trial court, we discern no error.

Appellants also claim TNT is not entitled to recovery because they acted with unclean hands. Our Supreme Court has stated,

> a court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue.

*Terraciano v. DOT*, 753 A.2d 233, 237-38 (Pa. 2000) (citations omitted). The burden of proving unclean hands is on Appellants. *See Montgomery Bros., Inc. v. Montgomery,* 112 A. 474, 475 (Pa. 1921).

Appellants' argument is, again, all but devoid of legal authority; Appellants characterize the facts in the light most favorable to themselves and ask that we reweigh the evidence. Appellants' Brief at 38-45. In contrast, the trial court ably addressed Appellants' clean-hands claim. Trial Court Opinion, 2/21/20, at 71-72. The court acknowledged, as it had throughout the decision, billing discrepancies by TNT which resulted in Appellants being overcharged. *Id.* at 71. However, the court also determined that both parties were complicit — TNT for not being "more transparent and communicative in its billing practices," and Appellants for allowing "TNT to perform such extensive work without clear agreements as to billings and practices." *Id.* at 71-72. The court further found TNT's conduct did "not rise to the level of 'fraud' or 'deceit' or otherwise 'shock the conscience' of the [c]ourt to justify barring [TNT's] recovery under the doctrine of unclean hands." *Id.* at 72. The court explained it addressed the overbilling and other "improper" charges by "appropriate deductions in its calculation of the reasonable value of TNT's services." *Id.*

Appellants have not cited any legal authority to support a claim that the trial court misapplied the law. While we have undertaken careful review, it is not our responsibility to comb through the record for factual underpinnings of

a claim, or to find support for Appellants' contention that TNT's conduct amounted to more than billing errors and/or misunderstandings between the parties, *i.e.*, unclean hands. *See Commonwealth v. Mulholland*, 702 A.2d 1027, 1034 n.5 (Pa. Super. 1997) ("In a record containing thousands of pages, this court will not search every page to substantiate a party's incomplete argument."). Appellant's first issue does not merit relief.

In their combined second and third issues, Appellants argue the trial court did not apply the correct "legal analysis in determining the reasonable value of labor and specimen trees supplied by TNT." Appellants' Brief at 45. Appellants complain the trial court did not follow this Court's decision in *Temple Univ. Hosp. Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501 (Pa. Super. 2003).[4] *Id.* at 45-59.

We note that *Temple* involved a billing dispute between a hospital and health insurance provider over Medicaid fees. *Id.* at 504. This Court, in upholding the trial court ruling that the insurer had underpaid Temple and was unjustly enriched, disagreed with the trial court that the correct fees were the hospital's published fees. *Id.* at 507-09. We stated the correct standard for determining fees as follows:

> Where, as here, there is no express agreement to pay, the law implies a promise to pay a reasonable fee for a health provider's

---

[4] While Appellants assert the trial court erred in its application of *Temple*, in fact, they again devote most of their argument to depicting the evidence in the light most favorable to themselves, and asking this Court to reweigh the evidence in their favor. Appellants' Brief at 45-59.

services. Thus, in a situation such as this, the defendant should pay for what **the services are ordinarily worth in the community. Services are worth what people ordinarily pay for them.** Whether the amount charged is unconscionable and whether it shocks the conscience is irrelevant.

*Temple*, 832 A.2d at 508 (citations omitted, emphases added).

This Court in *Temple* also noted the limits of its decision because of the participants (a not-for-profit teaching hospital and a health insurance provider), state and federal regulations involved in Medicaid billing, and the peculiar nature of healthcare billing in general where published rates are rarely paid and insurance providers routinely negotiate their rates with providers. *Id.* at 504-06, 508-09.

Here, the trial court distinguished *Temple*, noting the unique and different nature of landscaping, and the fact that neither party provided evidence of what customers would "ordinarily" pay for a project such as Appellants', which was out of the ordinary. Trial Court Opinion, 2/21/20, at 33-34. The court was "forced to look to the evidence presented at trial to craft its best approximation of what 'people in the community ordinarily pay' for the type of work performed by TNT for [Appellants'] project." *Id.* at 34. Upon review, we see nothing in *Temple* which compels a trial court to look at other customers' invoices to determine reasonable value, or conversely, precludes a court from relying on expert testimony. Moreover, after careful consideration, we conclude the trial court's well-reasoned opinion thoroughly and capably explains why this issue lacks merit. We therefore adopt the

- 14 -

court's reasoning as our own in disposing of this issue. **See** Trial Court Opinion, 8/24/20, at 21-31.

Finally, Appellants claim the trial court granted "a windfall to TNT by failing to limit TNT's *quantum meruit* recovery to an amount that did not exceed its actual costs, based on industry standards." Appellants' Brief at 59. This issue is deficient in that it is essentially a summation and repeat of the conclusion in Appellants' prior issues, in which they represent the facts favorably to themselves, and suggest their rendition of the facts warrants a finding by this Court that is contrary to that of trial court. This argument is further undercut by Appellants' failure to develop it with citation to legal authority. We have explained:

> The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention. This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, we observe that the Commonwealth Court, our sister appellate court, has aptly noted that [m]ere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of [a] matter.

**Coulter v. Ramsden**, 94 A.3d 1080, 1088-89 (Pa. Super. 2014) (citations omitted). For these reasons, this final issue lacks merit.

Judgment affirmed.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/21