J-A29002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ELIZABETH EQUIPMENT SERVICES, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| SENTERRA BUILDING AND DEVELOPMENT, INC. | : | No. 154 WDA 2023 |

Appeal from the Judgment Entered May 26, 2023
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD1715065

BEFORE: BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:          **FILED: April 11, 2024**

Elizabeth Equipment Services, Inc. ("Elizabeth") appeals from the judgment entered on the non-jury verdict in its favor against Senterra Building and Development, Inc. ("Senterra"). We affirm.

The history of this case is as follows. Elizabeth is an excavation contractor owned by Arthur Smith. Senterra, owned by James Dinert, is a residential housing developer. The owners had known each other for years and worked together on multiple projects. In 2014, Senterra hired Elizabeth to perform excavation and site preparation on a townhouse project to be known as Ellison Place in Castle Shannon, Allegheny County, Pennsylvania. On or about September 8, 2014, the parties executed American Institute of

Architects standard form agreement A107-2007 to memorialize their agreement ("Contract").[1]

Pursuant to the Contract, Senterra was to pay Elizabeth the stipulated sum of $308,269, "[s]ubject to mutually signed written change orders." Contract, 9/8/14, at § 3.2. The Contract referenced Elizabeth's Quote No. 222 ("Quote") for the itemization of the unit prices, again indicating the amount was "[s]ubject to [a] mutually signed change order or acknowledgment job slip signed by owner." *Id*. at § 3.2.2. ***See also id***. at § 6.1.2 (denoting Quote No. 222 as "The Supplementary and other Conditions of the Contract"). For allowances included in the stipulated sum, the Contract referred to the notes to Quote No. 222 ("Notes"), which were also appended to the Contract. The Notes included the agreement that "any alterations or deviations from this Contract or the engineered plans will become an 'extra charge' separate from this Contract, with payment conditions the same as this Contract." ***Id***. at Note H (capitalization altered).

The Contract indicated that Elizabeth was to submit to Senterra progress invoices every thirty days, and Senterra was to make the payment to Elizabeth within thirty days thereafter, with any remaining balance subject to interest

---

[1] The date was left blank on the first page of the agreement, and no date accompanied the signatures. However, the list of exhibits to the Contract was dated September 8, 2014. The Contract is found in the certified record as Exhibit A to Elizabeth's operative complaint and was admitted at trial without objection as Exhibit 1. ***See*** N.T. Trial, 1/19/22, at 52.

at 1.5% per month. *Id*. at Note E. The Contract further specified that Senterra would withhold a ten percent retainage from each payment.[2] *Id*. at § 4.1.4. To obtain final payment, Elizabeth was to provide written notice that its work was ready for final inspection and acceptance and submit a final application for payment. *Id*. at § 15.5.1. However, final payment would "not be due until [Elizabeth] has delivered to [Senterra] a complete release of all liens arising out of this Contract or receipts in full covering all labor, materials[,] and equipment for which a lien could be filed, or a bond satisfactory to [Senterra] to indemnify [it] against such lien." *Id*. at 15.5.2. Final payment was required to be made no later than thirty days after the "Castle Shannon Borough Engineer has inspected and approved [Elizabeth]'s work." *Id*. at § 4.2.2.

Elizabeth commenced work pursuant to the Contract and submitted monthly applications for payment to Senterra, which Senterra paid. During the course of its performance, Elizabeth submitted four documents to Senterra titled "CHANGE ORDER / CONTRACT ADDENDUM." The first two, Change Orders Nos. 1 and 2, amounted to net additional costs of $7,680 and $3,000,

---

[2] A retainage is "[a] percentage of what a landowner pays a contractor, withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired." RETAINAGE, Black's Law Dictionary (11th ed. 2019).

were signed by Mr. Dinert on behalf of Senterra, and were subsequently paid.[3]

The last two, Change Orders Nos. 3 and 4, were respectively dated May 20, 2015, for $8,272.80, and dated July 28, 2015, for $5,781.25. **See** N.T. Trial., 1/19/22, at Exhibit 2.[4]

Unlike Change Orders Nos. 1 and 2, Change Orders Nos. 3 and 4 did not specify whether there were items to be deducted from the Contract in connection with the change, did not provide a net cost amount for the change, and were not signed by a representative of Senterra.[5] Nonetheless, Senterra paid Elizabeth for all four change orders. **See id**. at 96 (Mr. Dinert confirming payment), 144 (Mr. Smith confirming payment). Indeed, Elizabeth's ninth

---

[3] In calculating the final contract price in light of the change orders, Elizabeth listed $19,000 as the amount of Change Order No. 1. In doing so, it improperly utilized the gross cost of the new obligation rather than the net increase after accounting for the $11,320 that was subtracted from the Contract due to the change. The signed change order indicated a "total additional contract cost" of $7,680. **See** N.T. Trial, 1/19/22, at Exhibit 2.

[4] Elizabeth did not ensure that the trial exhibits were made part of the record certified to this Court as was its duty as the appellant. **See**, **e.g.**, **Commonwealth v. Harlan**, 208 A.3d 497, 501 (Pa.Super. 2019) ("Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty."). However, our review is not hampered because the pertinent documents, identified and described in the trial transcript, are included elsewhere in the certified record.

[5] Elizabeth's eighth progress invoice listed the amount of Change Order No. 4 as $2,376. **See** N.T. Trial, 1/19/22, at Exhibit 2. It does not appear that the progress invoice by which Elizabeth charged Senterra for Change Order No. 3 was offered into evidence or otherwise filed of record.

and final progress invoice, dated October 5, 2015, was for $31,869.14, which was the sum that Senterra had deducted for the retainage. *Id*. at Exhibit 3.

Senterra became unable to meet its payment obligations. Mr. Dinert asked Mr. Smith to be patient and refrain from filing any liens on behalf of Elizabeth while it sought supplementary financing. *Id*. at 129, 150. While Elizabeth had previously executed a no-lien document in favor of West View Bank in connection with its financing of the project, Elizabeth declined Senterra's request to agree to forgo filing any liens against it to facilitate the additional financing. *Id*. at 129. Ultimately, on June 17, 2016, Senterra paid the September 30, 2015 progress invoice, along with one-half of the retainage billed in the final invoice, leaving an outstanding balance of $15,934.57, namely the other half of the retainage. *Id*. at Exhibit 3. Senterra indicated the balance would be released upon Elizabeth's provision of a maintenance bond for the sanitary sewer and storm sewer. *Id*. at Exhibit 3. Elizabeth refused based upon the Contract's provision that Elizabeth was not responsible for any bonds unless the Contract so indicated. *See* Contract, 9/8/14, at Note D ("All permits, bonds, inspection fees, testing fees, and engineering layout supplied by others unless noted." (capitalization altered)).

On November 30, 2017, Elizabeth initiated the instant proceedings by complaint. After rounds of objections and amendments, Elizabeth filed a fourth amended complaint stating claims of breach of contract and unjust enrichment. Elizabeth sought damages totaling $49,176.40, which was the

sum of the $15,934.57 withheld retainage, $9,321 in interest on the retainage, and $23,920.37 for unbilled work. *See* Amended Complaint, 5/9/19, at Exhibit C-1. Senterra's answer and new matter stated that the withheld half of the retainage was still not due because Elizabeth had not completed all conditions precedent to final payment, denied that it owed interest or any additional amounts, and asserted set-offs.

The case proceeded to a non-jury trial on January 19, 2022, at which the court heard testimony from Mr. Smith; Mr. Dinert; the attorney who contacted Mr. Smith about Elizabeth waiving liens; and an engineer Senterra hired, who in 2020 determined that Elizabeth had not built a water detention basin to Contract specifications because it did not hold the required volume.

At trial, Elizabeth's position was that it fully performed the Contract, but Senterra withheld half of the retainage because it lacked funds to pay, and therefore it invented "hogwash," *post hoc* justifications for the withholding. *See* N.T. Trial, 1/19/22, at 129, 146, 150. Elizabeth's evidence supported the notion that Senterra offered ever-changing reasons why it did not release the remainder of the retainage.

For example, by letter of June 12, 2016, accompanying the last payment it made, Senterra indicated the balance would be released upon Elizabeth's provision of a maintenance bond for the sanitary sewer and storm sewer. *Id*. at Exhibit 3. At his 2018 deposition, Mr. Dinert stated that he had no problems with Elizabeth's work, but payment was not due because it had not released

its liens. *Id*. at 27. At one point Senterra indicated that it would not pay because Elizabeth had not done all work required by the Contract, namely certain testing. *Id*. at 67. In 2020, approximately five years after Elizabeth left the site, Senterra claimed that it discovered that Elizabeth's work was not in accordance with the specifications, requiring Senterra to pay to have a water retention pond deepened and revegetated.[6] *Id*. at 75-76.

The remainder of damages sought by Elizabeth was for Contact work that it claimed to have completed but had failed to submit to Senterra for payment. Mr. Smith testified that the amount mistakenly not billed was $23,920.37 and was discovered after the lawsuit was filed when Elizabeth "went back through and re-audited the contract." *See* N.T. Trial, 1/19/22, at 145.

Following the conclusion of testimony, the court permitted the parties to submit post-trial briefs, which they did not file of record. On June 2, 2022, the court filed a general non-jury verdict in favor of Elizabeth in the amount of $26,614.57, which was slightly more than half of the damages Elizabeth sought. Senterra filed post-trial motions *nunc pro tunc* on October 7, 2022. Elizabeth promptly filed a response and its own request for post-trial relief. After a hearing, the trial court by order of January 9, 2023, denied both

---

[6] Mr. Dinert acknowledged that Senterra never contacted Elizabeth to inform it that its performance was inadequate or to request that it correct the work. *See* N.T. Trial, 1/19/22, at 89.

- 7 -

parties' motions but offered a breakdown of the verdict. Specifically, the verdict was the sum of: (1) the remaining retainage of $15,934.57; (2) the $7,680 billed for Change Order No. 1; and (3) the $3,000 agreed to for Change Order No.2.

Elizabeth filed a timely notice of appeal.[7] The trial court did not order Elizabeth to file a Pa.R.A.P. 1925(b) statement, and none was filed. The court submitted a Rule 1925(a) opinion addressing the issues raised in Elizabeth's post-trial motion. Elizabeth presents the following questions for our consideration:

1. Whether the trial court abused its discretion and/or committed an error at law in determining that there was no breach of contract by Senterra regarding the two change order/addendum(s) to the Contract that were not mutually signed by the parties, whereby Elizabeth was not entitled to recover damages for the unsigned . . . Change Orders No. 3 and 4 despite the fact that the additional work set forth on Change Orders Nos. 3 and 4 were completed by Elizabeth . . . and had already been paid in full by [Senterra] and the trial court likewise abused its discretion and/or committed an error at law in only awarding [Elizabeth] the sum of $26,614.57.

2. Whether the trial court abused its discretion and/or committed an error at law in determining that the assessment of interest only applied to progress payments and not final payment due under the Contract.

_____

[7] On February 6, 2023, Elizabeth appealed from the order that denied its post-trial motion. Noting that orders denying post-trial motions are interlocutory and unappealable, this Court directed Elizabeth to praecipe for the entry of judgment. Since Elizabeth complied, we treat the appeal as a timely one from the judgment. *See Jones v. Rivera*, 866 A.2d 1148, 1149 n.1 (Pa.Super. 2005); Pa.R.A.P. 905(a)(5).

3.      Whether the trial court abused its discretion and/or
        committed an error at law in determining that there was no
        term or condition in the Contract assessing interest to the
        final payment, that Elizabeth did not provide Senterra with
        a Release of Liens and Senterra did not breach [§] 15.5.2
        or the Contract in general regarding final payment therefore
        Elizabeth was not entitled to recover damages for interest
        in relation to the final payment.

Elizabeth's brief at 3 (parentheticals omitted, capitalization altered).[8]

The separate arguments Elizabeth offers in its brief as to its three questions contain substantial overlap. Overall, Elizabeth asks this Court to find that the court should have awarded damages, pursuant to either contract law or *quantum meruit*, for: (1) the amount of the unsigned Change Orders Nos. 3 and 4, (2) the unbilled amounts Elizabeth discovered during the course of the litigation, and (3) interest at the rate of 1.5% on the withheld retainage. *See* Elizabeth's brief at 10-21.

We begin our assessment of these issues with a review of the applicable law. Initially we observe:

Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law.

_____

[8] Senterra asks us to dismiss this appeal based upon the deficiencies in Elizabeth's brief and reproduced record. *See* Senterra's brief at 8-11 (noting Elizabeth's failure to abide by portions of Pa.R.A.P. 2111-2119 and 2132-2135). While Elizabeth's brief certainly is not a model of compliance, we decline to sanction Elizabeth in this instance because the deficiencies have not hampered our ability to conduct meaningful review. *See*, *e.g.*, *Clark v. Peugh*, 257 A.3d 1260, 1264 n.1 (Pa.Super. 2021) ("While we do not condone Clark's failure to comply with the appellate rules in this case, our review has not been substantially impeded by his lack of compliance, and we therefore deny the request to [dismiss] this appeal.").

> Upon appellate review, the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. Our scope of review regarding questions of law is plenary.

*Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 956 (Pa.Super. 2023) (cleaned up). To the extent that we undertake interpretation and enforcement of the Contract, we decide questions of law. *See*, *e.g.*, *Pops PCE TT, LP v. R & R Rest. Grp., LLC.*, 208 A.3d 79, 87 (Pa.Super. 2019). "Furthermore, we may affirm the decision of the trial court on any valid basis appearing of record." *Louis Dreyfus Commodities Suisse SA v. Fin. Software Sys., Inc.*, 99 A.3d 79, 82 (Pa.Super. 2014).

As plaintiff, it was Elizabeth's burden to prove its claims by a preponderance of the evidence. *See*, *e.g.*, *Discover Bank v. Booker*, 259 A.3d 493, 496 (Pa.Super. 2021). To establish a claim for breach of contract, it had to prove the existence of a contract, breach of a contractual duty, and reasonably certain resultant damages. *Id*. at 496; *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988).

Elizabeth's alternative claim of *quantum meruit* "is defined as 'as much as deserved' and measures compensation under an implied contract to pay compensation as reasonable value of services rendered." *Angino & Rovner v. Jeffrey R. Lessin & Associates*, 131 A.3d 502, 508 (Pa.Super. 2016) (cleaned up). As our Supreme Court has explained:

> Where work has been done or services provided, a claim for damages in *quantum meruit* is fundamentally an equitable claim

of unjust enrichment. The party seeking recovery under this theory must demonstrate that it conferred benefits on the defendant, those benefits were appreciated by the defendant, and it would be inequitable for the defendant not to pay for them. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Melmark, Inc. v. Schutt by & Through Schutt*, 206 A.3d 1096, 1109–10 (Pa. 2019) (cleaned up).

Significantly, "[a]n action in contract is distinct from one in *quantum meruit* as demonstrated by the disparate measure of damages arising therefrom." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1251 n.6 (Pa. 2016). In that vein:

> Damages in a *quantum meruit* action are limited to the reasonable value of the services performed. Remedies for breach of contract are designed to protect either a party's expectation interest by attempting to put him in the position he would have been had the contract been performed; his reliance interest by attempting to put him in the position he would have been had the contract not been made; or his restitution interest by making the other party return the benefit received to the party who conferred it.

*Id*. (cleaned up). To establish its entitlement to recover under its alternative theory of *quantum meruit*, the burden was on Elizabeth to prove with reasonable certainty the value of the services it provided to Senterra. *See*, *e.g.*, *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 510 (Pa.Super. 2003).

Mindful of these legal principles, we turn to Elizabeth's claims for relief, beginning with its arguments that the trial court should have awarded it the

- 11 -

amounts of Change Orders Nos. 3 and 4. The trial court concluded that Senterra did not breach the Contract concerning these unsigned change orders because the Contract required all change orders to be signed by both parties. **See** Trial Court Opinion, 5/4/23, at 5 (citing Contract, 9/8/14, at §§ 3.2.2-3.2.3).

Elizabeth suggests that, because it performed the work included the amounts for Change Orders Nos. 3 and 4, it billed Senterra for those change orders, and Senterra submitted payment for those change orders despite not having signed them, Senterra waived the requirement that the orders be mutually signed. **See** Elizabeth's brief at 11. Alternatively, Elizabeth argues that by not contesting the unsigned change orders earlier and accepting the benefit of them, Senterra "is estopped to deny the work and thus has been unjustly enriched by the performance of the work." **Id**. at 7.

We reach the same conclusion as the trial court, albeit for a different reason. All parties agree that, at the time Elizabeth completed its work and submitted its final invoice, that "final invoice did not include the work and materials represented on Change Orders Nos. 3 and 4 **because those sums were already paid in full**[.]" Elizabeth's brief at 11 (emphasis added). **See also id**. at 14 (observing that, at the time final payment was sought, "the sums due under Change Orders Nos. 3 and 4 had been paid in full and what remained was invoices for retainage and general work not previously billed."). In other words, when Senterra made its final payment, it paid Elizabeth for all

the work that Elizabeth had billed in its eight progress invoices, **including the charges billed for the two unsigned change orders**. The only money that Elizabeth had asked for in its final request for payment under the Contract, and which remained owing after Senterra's June 17, 2016 payment, was half of the retainage.

Consequently, since Elizabeth had already been fully compensated in relation to the work and materials covered by Change Orders Nos. 3 and 4, there was no basis for the trial court to find that Elizabeth had sustained breach of contract or *quantum meruit* damages as to those orders. Indeed, awarding Elizabeth those damages at trial would have amounted to a double recovery. The trial court did not err in declining to do so.[9]

Putting aside for the moment the withheld half of the retainage, the only other amount Elizabeth claimed was still owing when it submitted its last progress invoice was "general work not previously billed," which Elizabeth "discovered in preparation of trial in the sum of $2[3],920.37[.]" *Id*. at 17. In particular, Mr. Smith testified that the amount mistakenly not billed was

---

[9] Rather, any error on this front was awarding Elizabeth damages for the two already-paid change orders that were mutually signed. However, because Senterra, while aggrieved by the trial court's ruling, did not file a cross-appeal raising this error, the propriety of the award for Elizabeth is not before us. *See*, *e.g.*, *Darrt Dev. Co. v. Tri-State Asphalt Corp.*, 609 A.2d 171, 174 n.2 (Pa.Super. 1992) (holding claim that trial court erred in holding the appellee responsible for fees was not properly before us since the appellee did not cross-appeal).

determined after the lawsuit was filed when Elizabeth "went back through and re-audited the contract." **See** N.T. Trial, 1/19/22, at 145. Mr. Smith testified that the amount was invoiced to Senterra on January 14, 2022, in a document prepared for trial.[10] **Id**. at 145, Exhibit 6. Mr. Smith was unable to offer any breakdown or description of the work that was unbilled, explained that his office staff generated the invoice, and apologized for not supplying "back-up paperwork" to support the billing. **Id**. at 186-87.

Elizabeth barely addresses the previously-unbilled $23,920.37 in its appellate brief.[11] Rather, it merely claims that it "went undisputed" that the unbilled work was performed, and therefore should have been awarded under either its contract claim or its claim for *quantum meruit*. **See** Elizabeth's brief at 14, 17. We disagree.

---

[10] Although Mr. Smith indicated that the unbilled $23,920.37 was discovered long after Elizabeth completed its work, Elizabeth at some point prepared an invoice for that amount dated October 5, 2015, which was the same date as the final progress invoice rather than during this litigation. **See** N.T. Trial, 1/19/22, at Exhibit 5. This October 5, 2015 invoice number is far out of sequence with the prior progress invoices and does not bear a progress invoice number as did the other invoices submitted on or before October 2015. **Id**. Further, Mr. Dinert did not recognize the invoice and Mr. Smith testified that he did not know when it was created. **Id**. at 48, 168-69. In any event, this invoice was not admitted into evidence at trial because it was not authenticated. **Id**. at 205.

[11] Elizabeth also did not point specifically to the trial court's failure to award these damages in its post-trial motion, and the trial court does not address them in its opinion.

Plainly, Elizabeth did not prove that Senterra breached the Contract by failing to pay a timely-submitted progress invoice that was submitted in accordance with the terms of the Contract. Instead, it faults Senterra for not paying an invoice that was created on the eve of trial, more than six years after Elizabeth submitted its final request for payment, without the slightest indication of what Contract work it covered. Thus, Elizabeth did not establish its entitlement to breach-of-contract damages as to the unbilled amount.

Likewise, Mr. Smith merely offered a bald dollar amount for after-discovered unbilled work without any explanation of what it represented or how it was calculated. This meager evidence failed to establish what work was performed or what its value was to Senterra, let alone why it would be unjust for Senterra to retain it. Hence, Elizabeth did not establish its entitlement to *quantum meruit* damages. **See Temple Univ. Hosp., Inc.**, 832 A.2d at 510 ("Unjust enrichment permits recovery of the reasonable value of a given service. The Hospital, as plaintiff, ha[d] the burden of proving damages to a reasonable degree of certainty in this action.").

Accordingly, we conclude that no relief is due from this Court pursuant to either theory of recovery as to the $23,920.37 for undelineated, unbilled work.

Elizabeth's remaining issue concerns the trial court's failure to award interest on the withheld half of the retainage. The trial court found that no such interest was due because (1) Elizabeth never complied with § 15.5.2 of

the Contract to trigger Senterra's duty to make the final payment, and (2) the Contract included only a provision for interest on overdue progress payments, not for the final payment. *See* Trial Court Opinion, 5/4/23, at 6-7.

Elizabeth argues that the trial court erred in making both rulings. It highlights the fact that Mr. Dinert knew before the Contract was executed that the only lien Elizabeth was willing to release up front was the one in favor of West View Bank that Elizabeth did execute, and the Quote indicated that and all bonds were to be supplied by others unless otherwise noted. *See* Elizabeth's brief at 19-20. Elizabeth further maintains that although the final progress invoice only encompassed the retainage and not any additional performance of Contract work, there was no distinction between it and the prior progress invoices for purposes of the 1.5% interest provision of Note E of the Contract. *Id*. at 17-19.

From a review of the trial evidence, we hold that the trial court properly found that Elizabeth did not establish that Senterra wrongfully withheld half of the retainage. As noted above, § 15.5.2 of the Contract provided that final payment would "not be due until [Elizabeth] has delivered to [Senterra] a complete release of all liens arising out of this Contract or receipts in full covering all labor, materials[,] and equipment for which a lien could be filed, or a bond satisfactory to [Senterra] to indemnify [it] against such lien." Contract, 9/8/14, at 15.5.2. Regarding when the final payment would become tardy, the Contact specified that it was required to be tendered no later than

- 16 -

thirty days after the "Castle Shannon Borough Engineer has inspected and approved [Elizabeth]'s work." ***Id***. at § 4.2.2.

Much ado was made at trial about what liens § 15.5.2 required Elizabeth to release. Senterra took the position that it was not bound to pay Elizabeth until after Elizabeth released all liens that it may file against Senterra. ***See***, ***e.g.***, N.T. Trial, 1/19/22, at 51. Elizabeth suggested that such an interpretation was absurd, since the purpose of the lien is to protect a contractor when the owner is unwilling or unable to pay. ***Id***. at 160 ("Why would I sign a release of liens for somebody I'm going to do $300,000.00 worth of work for and not get paid for it and not be able to ask him for it at the end while they wave goodbye?"). Elizabeth instead proffered that the import of § 15.5.2 was to protect Senterra from second-tier liens by requiring Elizabeth to demonstrate to Senterra that none of Elizabeth's subcontractors or vendors remained unpaid. ***Id***. at 191-92.

The plain language of § 15.5.2 supports Elizabeth's interpretation. That section offered Elizabeth three ways to make the final payment due: (1) providing Senterra a release of all liens; (2) presenting receipts to demonstrate that Elizabeth had paid for all labor, equipment, and material that it utilized such that there is no basis for Senterra to face a lien; or (3) posting "a bond satisfactory to [Senterra] to indemnify [Senterra] against such lien." Contract, 9/8/14, at § 15.5.2. It would make no sense for Elizabeth to post a bond to indemnify Senterra against a lien that Elizabeth

obtained against Senterra. In that instance, Elizabeth would end up paying itself if Senterra breached the contract. Nor is it reasonable to conclude that Elizabeth could not be paid until it eliminated a protection for recoupment of expenses it realized in performing the Contract.[12] Hence, we conclude that the only reasonable interpretation of § 15.5.2 is that it applied to the potential liens of Elizabeth's subcontractors and vendors, not to Elizabeth's potential lien against Senterra.

However, Elizabeth failed to offer evidence that it had ever complied with § 15.5.2's requirements. In particular, Mr. Smith's testimony: (1) included no indication that he gave Senterra a release of his subcontractors' and vendors' liens; (2) conceded that he did not recall supplying Senterra with receipts; and (3) expressly acknowledged that he did not provide a bond to indemnify Senterra. **See** N.T. Trial, 1/19/22, at 166-68. Instead, Mr. Smith proffered the justification for his non-compliance with the duty to release liens by observing that Mr. Dinert "never asked me for it." **Id**. at 164. Consequently, pursuant to the correct interpretation of § 15.5.2 that was advocated by Elizabeth, it did not take the necessary action to render the final payment due.

---

[12] **See**, **e.g.**, **Schell v. Murphy**, 153 A.3d 379, 381 (Pa.Super. 2016) ("Such liens are designed to protect persons who, before being paid (or fully paid), provide labor or material to improve a piece of property.").

Furthermore, while the evidence certainly established that the Castle Shannon Borough Engineer approved the design plan before construction began, *id*. at 74, Elizabeth failed to prove that the Borough Engineer inspected and approved Elizabeth's work after it was completed. Mr. Smith testified that the Borough Engineer had been on site every day that pipe was laid, when the excavation was backfilled, and at some undisclosed time when testing was done. He also indicated that Elizabeth had been off the jobsite by October 5, 2015, when it submitted the invoice for the retainage. *Id*. at 149-54. However, Elizabeth offered no testimony or documentation to establish that the Borough Engineer approved Elizabeth's work, let alone when the approval occurred.

For his part, Mr. Dinert declined to acknowledge post-completion approval by the borough, indicating that he instead released half of the retainage to Elizabeth as a show of good faith to Mr. Smith. *Id*. at 83. Senterra also produced evidence that, years later, Castle Shannon Borough required certain testing to be done on Elizabeth's work that Elizabeth was supposed to have done as part of the Contract. *Id*. at 236-38.

In short, Elizabeth failed to establish at trial that it performed the necessary actions to trigger Senterra's duty to issue the final payment at the time it was requested. Thus, assuming *arguendo* that Elizabeth is correct that the final payment was subject to the 1.5% interest applicable to invoices that were overdue by more than thirty days, it did not prove that Senterra's

payment of the remaining half of the retainage fell within that provision.[13]

Therefore, the court had no basis to award or calculate interest for an overdue

progress payment pursuant to Note E of the Contract.

Since we conclude that the trial court committed no error that entitles

Elizabeth to relief, we affirm the judgment entered on the non-jury verdict.

Judgment affirmed.

_____

[13] It is not at all clear that Elizabeth is correct. The Contract created distinct requirements for progress payments, which were governed by Article 4.1, and final payment, to which Article 4.2 pertained. Article 4.1 contemplated interest on overdue progress payments, which do not require inspection and approval and from which a retainage is withheld pending determination that the work was satisfactorily completed. *See* Contract, 9/8/14, at §§ 4.1.4-4.1.5. Final payment, defined as "the unpaid balance of the Contract [s]um" and which in this case was solely the retainage, did not provide for interest. *See id*. at § 4.2.1. Since, as noted above, a retainage is "withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired," RETAINAGE, Black's Law Dictionary (11th ed. 2019), it appears obvious that no interest should accumulate on the retainage while liens have not been released and work not yet deemed satisfactory. Rather, if the owner wrongfully failed to make a final payment of the liquidated sum that was due because the contractor satisfied its Article 4.1 obligations, the contractor can obtain prejudgment interest dating back to the owner's breach. *See*, *e.g.*, *Davis v. Borough of Montrose*, 194 A.3d 597, 613 (Pa.Super. 2018). Here, Elizabeth does not argue that it is entitled to prejudgment interest based on these principles, but limited its arguments to the contractual interest applicable to progress payments. In any event, our determination that Elizabeth failed to establish that the withheld portion of the retainage was past due moots the issue.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

4/11/2024